525 N.E.2d 298 (1988)
In the matter of Adoption of T.R.M., an Indian Child.
and J.Q., (Natural Mother), Appellant,
v.
D.R.L. AND E.M.L. (ADOPTIVE PARENTS), Appellees.
No. 64S03-8807-JV-607.
Supreme Court of Indiana.
July 6, 1988.
Rehearing Denied September 28, 1988.
*301 Joanne Tapocsi, Valparaiso, Barry Levine, Traverse City, for appellant.
Hugo E. Martz, Guardian Ad Litem, Steven Langer, Valparaiso, for appellees.

ON CIVIL PETITION TO TRANSFER
DICKSON, Justice.
The power of state courts to conduct adoption proceedings involving children of Indian ancestry may be subject to significant limitations under the Indian Child Welfare Act ("ICWA"), 25 U.S.C. §§ 1901-1963 (1982). The central issue in this case is whether a state adoption proceeding was proper and valid under the ICWA.
T.R.M. ("the child") was born on June 14, 1981, in Hot Springs, South Dakota. Her biological mother is J.Q. Her paternity has not been established. In the summer of 1974, J.Q. met D.R.L. and E.M.L. ("adoptive parents") when the adoptive parents began travelling to the Pine Ridge Reservation, Shannon County, South Dakota, where the Oglala Sioux Indian Tribe ("Tribe") is located. The adoptive parents went to the reservation to visit a mission sponsored by their church organization. During the ensuing years, J.Q. and the adoptive parents became good friends. On two separate occasions J.Q. asked the adoptive parents if they would take her children and raise them if anything ever happened to her. The adoptive parents agreed to do so. During this time, the adoptive parents met and became friends with J.Q.'s since-divorced husband, G.C.M. ("the former husband").
In April, 1981, J.Q. telephoned the adoptive parents at their residence in Porter County, Indiana, requesting that they keep *302 their prior promise and adopt her unborn child. J.Q. called again in May, 1981, to confirm the plans for the adoption. The adoptive parents agreed to adopt the child.
The child was born out of wedlock on June 14, 1981, not on the reservation, but in a hospital at Hot Springs, South Dakota. On June 19, 1981, J.Q. telephoned the adoptive parents informing them that the child had been born and requested that they come and get the baby. When the adoptive mother arrived in Hot Springs the following day, she went to see J.Q. at a motel where J.Q. lived with her other children. J.Q. asked the adoptive mother to take the child with her. The adoptive mother agreed, accepted the infant child, and took the child with her. The former husband was present and did not object to the transfer. On the next day, June 21, 1981, J.Q. signed a consent form to the adoption. The adoptive mother returned to Porter County, Indiana, with the child, who was then 7 days old. The child, now age seven, has resided with the adoptive parents in Porter County, Indiana, ever since.
Other than two telephone calls and two letters from J.Q. to the adoptive parents within two weeks after the adoptive mother returned to Indiana with the child, J.Q. made no further contact with either the child or the adoptive parents until she filed a habeas corpus action in the Porter Circuit Court in April of 1982. The Tribe also filed a similar action claiming jurisdiction in the Oglala Sioux Tribal Court. The trial court heard evidence on the petitions for habeas corpus relief on September 24, 1982, and on October 21, 1982, dismissed the Tribe's petition for failure to appear and present evidence at the hearing. The trial court also denied J.Q.'s petition and granted temporary custody of the child to the adoptive parents.
On September 22, 1982, the adoptive parents filed a petition for adoption of the child with the trial court. On November 29, 1982, the Indian tribal court, through the Indian Child Welfare Advocate, filed a motion to transfer the case to the Indian tribal court and attached a copy of an order of wardship of the child which had been entered by the Indian tribal court on September 21, 1982, the day prior to the adoptive parents' filing of the adoption petition in the trial court. On September 29, 1983, and October 19, 1983, the Porter Circuit Court heard evidence concerning the jurisdictional matter and the adoption proceeding, and on November 28, 1983, granted the adoption.
On appeal by the natural mother, the Court of Appeals reversed on grounds that exclusive jurisdiction had vested in the Indian tribal court pursuant to the order of wardship entered on September 21, 1982. Adoption of T.R.M. v. D.R.L. (1986), Ind. App., 489 N.E.2d 156. We hereby grant transfer and affirm the trial court.
Since the principal thrust of the argument of appellant J.Q. and the Tribe is that the Porter Circuit Court adoption proceedings and judgment are contrary to the ICWA, the public policy goals of Congress in enacting the ICWA are of particular importance. In this regard, we find particularly helpful the following observations of the Oklahoma Supreme Court in In re Adoption of Baby Boy D (1985), Okla., 742 P.2d 1059, 1062-63, reh'g denied (1987), cert. denied, (1988), ___ U.S. ___, 108 S.Ct. 1042, 98 L.Ed.2d 1005:
The Indian Child Welfare Act (ICWA) is structured around the concern "that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies" and in non-Indian homes and institutions. [25 U.S.C. § 1901(4)] Congress has declared the policy of this Nation in passing the ICWA as follows:
"... [T]o protect the best interest of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture... ." [25 U.S.C. § 1902]
The central thrust and concern of the ICWA is, therefore, "the establishment *303 of minimum federal standards for the removal of Indian children from their families".
Numerous provisions of the act support this conclusion.
Section 1901(4) states:
"[A]n alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them... ."
Section 1911(a) provides exclusive jurisdiction in the Indian tribe:
"Over any child custody proceeding involving an Indian child who resides or is domiciled within the reservation... ."
Section 1912 addresses pending court proceedings. Subsection (d) requires:
"Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.["] (emphasis added).
Subsection (e) declares:
"No foster care placement may be ordered in such proceeding in the absence of a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." (emphasis added).
Subsection (f) states:
"No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional physical damage to the child.["] (emphasis added).
The Indian Child Welfare Act is applicable, therefore, when we are confronted with the removal of Indian children from their families. The purpose of the act is to promote the best interest of Indian children through promoting the stability and security of Indian tribes and families by the establishment of minimum federal standards for the removal of Indian children from their families. The act is applicable when you have Indian children being removed from their existing Indian environment.
[emphasis in original; footnotes deleted]
In the case before us, the child's biological ancestry is Indian. However, except for the first five days after birth, her entire life of seven years to date has been spent with her non-Indian adoptive parents in a non-Indian culture. While the purpose of the ICWA is to protect Indian children from improper removal from their existing Indian family units, such purpose cannot be served in the present case before this Court. From the unique facts of this case, where the child was abandoned to the adoptive mother essentially at the earliest practical moment after childbirth and initial hospital care, we cannot discern how the subsequent adoption proceeding constituted a "breakup of the Indian family." We therefore hold that, separate from and independent of our consideration of the merits of appellant's specific issues, the ICWA should not be applied to the present case in which the purpose and intent of Congress cannot be achieved thereby.
However, notwithstanding our decision that the ICWA should not apply to the adoption proceeding in the instant case, we shall proceed to independently discuss the issues raised, as a separate and independent basis for our decision.[1]
*304 The ICWA is facially implicated because the parties have stipulated that J.Q. is an Indian, that the child is an Indian child, and that the Tribe is the Indian child's tribe, all as defined in § 1903 of the ICWA. Section 1911 of the ICWA provides:
(a) Exclusive jurisdiction
An Indian tribe shall have jurisdiction exclusive as to any State over any child custody proceeding involving an Indian child who resides or is domiciled within the reservation of such tribe, except where such jurisdiction is otherwise vested in the State by existing Federal law. Where an Indian child is a ward of a tribal court, the Indian tribe shall retain exclusive jurisdiction, notwithstanding the residence or domicile of the child.
(b) Transfer of proceedings; declination by tribal court
In any State court proceeding for the foster care placement of, or termination *305 of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent, upon the petition of either parent or the Indian custodian or the Indian child's tribe: Provided, That such transfer shall be subject to declination by the tribal court of such tribe.
(c) State court proceedings; intervention
In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child, the Indian custodian of the child and the Indian child's tribe shall have a right to intervene at any point in the proceeding.
(d) Full faith and credit to public acts, records, and judicial proceedings of Indian tribes
The United States, every State, every territory or possession of the United States, and every Indian tribe shall give full faith and credit to the public acts, records, and judicial proceedings of any Indian tribe applicable to Indian child custody proceedings to the same extent that such entities give full faith and credit to the public acts, records, and judicial proceedings of any other entity.
The Indian tribal court is thus granted exclusive jurisdiction under § 1911(a) in the event of either: 1) residence or domicile of the child within the reservation; or, 2) tribal court wardship of the child. Where an Indian child is not domiciled or residing within the reservation, § 1911(b) provides for tribal jurisdiction unless the state court finds good cause to the contrary.
We first address the determination of residency and domicile of the child within the framework of the detailed findings of fact made by the trial court in the adoption order.[2] This order also incorporated by reference certain findings which it had previously made in the habeas corpus proceeding. These combined findings included, inter alia, the following:
At the time of the "consent" [J.Q.] was not residing on the Pine Ridge Reservation nor was she living on the reservation at the time of [the child's] birth. She was living off the reservation. She says [that] had there been housing available, she would have lived on the reservation. The Court does not find her to be credible in this regard notwithstanding her statement that she always wanted to return to the reservation. She had lived off the reservation for over two years and in the states of Nebraska and Colorado. Domicile is a place where a person has his true, fixed permanent home and to which place he has, whenever absent, the intention of returning. This Court finds that [J.Q.] did not have her true, fixed permanent home on the Pine Ridge Reservation and had in the foreseeable future no intention of returning to the reservation. Further, it is noted that in the consent that [J.Q.] signed on June 21, 1981, she acknowledged that she was not residing on the reservation. She was domiciled and a resident of Hot Springs, South Dakota.
* * * * * *
Here, the natural Indian parent of [the child] placed her in the complete and total care, custody and control of [the adoptive parents] intending by such action to voluntarily give up her rights in [the child] permanently notwithstanding the invalidity of the adoption consent. Such action on the part of the mother causes this Court to conclude such parental abandonment constitutes an emancipation of the child under South Dakota statutes. Such abandonment is further underscored by the lengthy delay in the filing of [J.Q.'s] Petition for Writ of Habeas Corpus, which was not filed until April 16, 1982, some ten months after the birth of the child. [J.Q.'s] reasons that Court proceedings were not instituted sooner are not substantiated by the evidence. * * *
The findings of fact of the trial court are conclusive on questions of credibility of witnesses. It is not our function here to re-weigh the evidence. In re Adoption of Jackson (1972), 257 Ind. 588, 277 N.E.2d 162.
Domicile means the place where a person has his true, fixed, permanent home, and principal establishment, and to which place he has, whenever he is absent, *306 the intention of returning. State Election Bd. v. Bayh (1988), Ind., 521 N.E.2d 1313; Croop v. Walton (1927), 199 Ind. 262, 157 N.E. 275. Domicile is of three kinds: domicile of origin or birth, domicile by choice (which has for its true basis or foundation the intention of the person), and domicile by operation of law. Id.
The general rule in Indiana is that the residence of a family follows that of the father. However, when by agreement or for justifiable reasons the parents of a child are living apart and have separate domiciles, the residence or domicile of the child would follow the residence of the parent with whom the child is living. In re Marriage of Rinderknecht (1977), 174 Ind. App. 382, 367 N.E.2d 1128.
The record supports the trial court's findings that J.Q., and consequently the child, were domiciled in Hot Springs, South Dakota, and that the child was never domiciled on the reservation. Any contact the Tribe could assert was with the mother and not the child. See In re J.R.H. (1984), Iowa, 358 N.W.2d 311. Therefore, the tribal court could not have exercised exclusive jurisdiction based on domicile pursuant to § 1911(a).
We must next determine whether the Tribe had exclusive jurisdiction under § 1911(a), notwithstanding the lack of tribal residence and domicile, by reason of an order of wardship by the tribal court. Acting on a petition filed by J.Q. in August of 1981, the tribal court entered an order of temporary custody of the child in September 1982. This order came over a year after the child was born and over 5 months after the Tribe and J.Q. filed the habeas corpus petitions.
The wardship order was entered ostensibly pursuant to § 1911(a). We find that § 1911(a) can pertain only to such wardship orders of the tribal court which are entered while the child is residing or domiciled on the reservation. This allows the tribal court to exercise subsequent exclusive jurisdiction notwithstanding a state court proceeding when the domicile or residence of the child has changed after the initial tribal court order of wardship. The tribal court could not be empowered to effectuate the status of a child as a "ward of the court" relying upon § 1911(a) where the child was never domiciled on the reservation, and was not residing on the reservation at the time the tribal court exercised jurisdiction and entered the wardship order.
Section 1911(d) requires that the state court give full faith and credit to the public acts, records and judicial proceedings of the Indian tribe to the same extent that the state court gives full faith and credit to those of any other entity. The statute does not require the state court to give absolute deference to a tribal court order regardless of the circumstances. Under Indiana law all foreign judgments are open to collateral attack for lack of jurisdiction. United States Constitution Article 4, Section 1; Trial Rule 12(B)(1); Ulrey v. Ulrey (1952), 231 Ind. 63, 106 N.E.2d 793.
Moreover, we find the Tribe has waived its right to claim exclusive jurisdiction under § 1911(a). When the trial court entered its order under the habeas corpus action, it was unaware that the tribal court had purported to enter an order of wardship regarding the child. We agree with the analysis of the Court of Appeals in Lee v. DeShaney (1983), Ind. App., 457 N.E.2d 604, 607 n. 7:
The issue of finality is determined by the law of the state which rendered the order, but, if the law of such state is not brought to the attention of the court[,] the court will not institute inquiries on its own.
The Tribe first asserted its order of wardship as its jurisdictional basis in the adoption proceeding contending that the wardship order entered one day before the filing of adoption petition prevented jurisdiction from vesting in the state court. The tribal court did not pursue its right to assert exclusive jurisdiction under §§ 1911(a) and (d) during the habeas corpus proceeding, an appropriate civil proceeding to question the custody of a child. The doctrine of res judicata applies to habeas corpus proceedings as to issues of law and *307 fact necessarily involved in that result. Although the tribal court thus waived any right which may have existed to claim exclusive jurisdiction under § 1911(a) by reason of the purported wardship order, it was not precluded from asserting § 1911(b) to further its interests in the adoption proceeding.
We thus find that the tribal court not only lacked jurisdiction to enter the wardship order, but also that it is bound by the adverse adjudication of its petition for habeas corpus. We therefore determine that § 1911(a) does not provide a basis for the vesting of exclusive jurisdiction in the tribal court.
To the extent that the ICWA may apply, this case falls under § 1911(b) jurisdictional grounds, and we next consider the proper standard for determining "good cause" for denying transfer of jurisdiction to the tribal court. The state is required by § 1911(b) to transfer such proceedings to the jurisdiction of the Tribe "absent good cause to the contrary." If the state court does not find an absence of good cause to the contrary, transfer is not required. The statute does not define "good cause" for purposes of § 1911(b). However, the Bureau of Indian Affairs of the Department of the Interior, in interpreting the Act, explains good cause in 44 Fed.Reg. 67,583, 67,591 (1979) as follows:
(a) Good cause not to transfer the proceeding exists if the Indian child's tribe does not have a tribal court as defined by the Act to which the case can be transferred.
(b) Good cause not to transfer the proceeding may exist if any of the following circumstances exist:
(i) The proceeding was at an advanced stage when the petition to transfer was received and the petitioner did not file the petition promptly after receiving notice of the hearing.
(ii) The Indian child is over twelve years of age and objects to the transfer.
(iii) The evidence necessary to decide the case could not be adequately presented in the tribal court without undue hardship to the parties or the witnesses.
(iv) The parents of a child over five years of age are not available and the child has had little or no contact with the child's tribe or members of the child's tribe.
(c) Socio-economic conditions and the perceived adequacy of tribal or Bureau of Indian Affairs social services or judicial systems may not be considered in a determination that good cause exists.
(d) The burden of establishing good cause to the contrary shall be on the party opposing the transfer.
These departmental guidelines are helpful but neither controlling nor binding upon state proceedings.[3]Cf. Batterton v. Francis (1977), 432 U.S. 416, 424, 97 S.Ct. 2399, 2405, 53 L.Ed2d 448, 456 ("Ordinarily, administrative interpretations of statutory terms are given important but not controlling significance."). These guidelines have been applied by state courts in deciding not to transfer jurisdiction to the tribal courts under § 1911(b). See, e.g., In re J.R.H., 358 N.W.2d at 317 ("In determining good cause, we may consider the circumstances when the `evidence necessary to decide the case could not be adequately presented in the tribal court without undue hardship of the parties or the witnesses.'").
Section 1902 of the ICWA provides in part "that it is the policy of this Nation to protect the best interests of Indian children... ." The Montana Supreme Court, while considering the above-mentioned guidelines in determining the issue of good cause, has also considered the "best interests *308 of the child," and has concluded that transfer may be defeated by a "clear and convincing showing" by the State. In re M.E.M. (1981), 195 Mont. 329, 336, 635 P.2d 1313, 1317. We agree that the best interests of the child are a valid consideration in determining the issue of good cause under § 1911(b).
The adoption trial court made the following finding of fact:
"15. There was good cause not to transfer this proceedings [sic] to the tribal court inasmuch as the evidence necessary to decide this case could not have been adequately presented in tribal court without undue hardship to the parties and the witnesses."
The trial court also found that J.Q. had abandoned the child causing the parental authority to cease, and that it was in the "best interests of the child" to grant the adoption. We apply an abuse of discretion standard to the trial court's findings, and will not reweigh the evidence. In re Adoption of Jackson, supra.
The facts favorable to the judgment of the adoption trial court are plentiful. J.Q. had a long history of drug and alcohol abuse. Her parenting record was not good. She had also been divorced from the same man twice for reasons relating to his alcohol use and physical abuse to her, and she intended to remarry him. She had been placed in jail on approximately fifteen occasions and had attempted to commit suicide at least four times, the most recent being in 1981. Motivated by a desire to remarry a former husband, J.Q. sought to remedy what she perceived as a stumbling block to the reconciliation, her pregnancy by another. She thus contacted the adoptive parents requesting they keep a prior promise to adopt her yet unborn child. Being fully aware of the non-Indian culture consequences of adoption, and having previously given up another child to adoption, J.Q. acknowledged in several conversations with the adoptive parents prior to the adoption that she fully understood the adoption would preclude her from ever exercising any parental rights to the child. She then voluntarily and willingly relinquished her rights in the child. Testimony by a psychologist and child protective child service worker for the county indicated that beyond a reasonable doubt, the custody of the child by J.Q. would likely result in serious emotional and physical harm to the child.
The child has resided in Indiana since the first week of her life. To now sever and dislodge the child from the family and culture she has known during all of her seven years of life cannot be anything except devastating to the best interests of the child. The purpose of the ICWA, to protect the interests of the Indian family, is patently clear. However, a paramount interest is the protection of the best interests of the child. 25 U.S.C. § 1902. See also In re Maricopa County Juvenile Action No. A-25525 (1983), Ariz. Ct. App., 136 Ariz. 528, 667 P.2d 228.
The adoption trial court not only found "good cause to the contrary" for denying transfer to the Tribe, but also found that "in the best interests of the child" transfer should be denied. The trial court properly considered the ICWA, and in this case, the spirit of the ICWA has been fulfilled. The concurrent state jurisdiction was properly exercised.
J.Q. and the tribal court assert three other grounds for the vesting of exclusive jurisdiction in the tribal court which we find unpersuasive for the following reasons.
J.Q. first argues that the adoptive parents improperly removed the child from the reservation and improperly retained custody of the child in violation of § 1920 of the ICWA:
Where any petitioner in an Indian child custody proceeding before a State court has improperly removed the child from custody of the parent or Indian custodian or has improperly retained custody after a visit or other temporary relinquishment of custody, the court shall decline jurisdiction over such petition and shall forthwith return the child to his parent or Indian custodian unless returning the child to his parent or custodian would subject the child to a substantial and *309 immediate danger or threat of such danger.
When the adoptive mother returned with the child to Indiana, she not only had J.Q.'s consent but J.Q. had relinquished and abandoned all care, custody and control of the child to the adoptive parents. Two weeks after the child resided in Indiana with the adoptive parents, J.Q. purported to revoke her consent and requested the child be returned, but J.Q. did not make further contact with the adoptive parents until she filed her habeas corpus petition in the state courts of Indiana some nine months later. She had not asserted any legal right to the child nor pursued other efforts to get the child back. The trial court exercised jurisdiction during the habeas corpus proceeding and ordered temporary custody of the child to the adoptive parents. Up to the time the adoption was granted, the adoptive parents had rightful custody of the child and were not retaining the child improperly. The adoptive parents neither improperly removed the child to Indiana nor did they improperly retain custody of the child as defined in § 1920 of the Act.
J.Q. and the Tribe next assert lack of subject matter jurisdiction in the state court based on the tribal court's continuing jurisdiction in the dissolution of J.Q.'s marriage. They contend that such continuing jurisdiction allows them to enter an order of wardship or modify the divorce decree at any time which in turn gives rise to exclusive jurisdiction under § 1911(a). We also find this argument to be without merit.
The divorce was granted by the tribal court November 14, 1980. Birth of the child occurred seven months later. However, the divorce decree made no mention of the unborn child. Furthermore, there has never been a judicial finding that the former husband is the biological father and J.Q. has stated that the contrary is true. The tribal court judge testified that the normal tribal procedure would be for the parents to seek a modification of the divorce decree regarding the custody, support, and visitation rights of the child. This was not done. Rather, J.Q. chose to file a distinctly different petition seeking an assumption of wardship by the tribal court. The divorce decree does not provide a basis for arguing continuing jurisdiction over the child.
Appellant J.Q. also contends that the ICWA requires proof of remedial and rehabilitative efforts to prevent the breakup of an Indian family by the party seeking to terminate parental rights, 25 U.S.C. § 1912(d), and that such proof is necessary before the adoption could be granted.
The trial court made the following conclusion: "Any rehabilitative efforts or social services to remedy (J.Q.) have been unsuccessful." In reviewing this matter we look to the record to determine whether the trial court abused its discretion in arriving at its finding. We will not reweigh the evidence, nor replace our views for those of the trial court. The following facts support the trial court's finding.
In March, 1981, four months after her divorce, J.Q. approached Diane Harmon, a registered nurse who was the supervisor of the obstetrics ward at the Public Health Service, an Indian hospital on the Pine Ridge Reservation. Mrs. Harmon is also the wife of the pastor of the Weslyn Emergency Group Mission, which is a licensed emergency crisis center located on the reservation. J.Q. had become acquainted with Mrs. Harmon in the prior eight years and had used the mission facilities on different occasions. J.Q. informed Mrs. Harmon that she was five months pregnant and that she had considered aborting the child because she was attempting a reconciliation between herself, her former husband, and their three children, and that the unborn child would prevent that reconciliation because the former husband was not the biological father. Mrs. Harmon counselled repeatedly against the abortion and then suggested adoption as an alternative.
J.Q. was thus considering adoption in lieu of abortion of her unborn child in an effort to prevent the breakup of her existing family when she contacted the adoptive parents. She told the adoptive mother that the child was not her former husband's child, with whom she was trying to reconcile, and that she did not want this child to *310 grow up like one of her other four children who had a different father and as a result would be insecure as a member of the family. The actions of the adoptive parents to adopt and raise the child can thus be seen as an active effort to reunite the pre-existing Indian family unit consisting of J.Q., her former husband, and their three children. The spirit and requirements of § 1912(d) were fulfilled.
Appellant J.Q. further seeks reversal of the adoption decree by contending that there was an absence of sufficient evidence to support the trial court's findings that J.Q. has had drug and alcohol problems and that efforts to remedy and rehabilitate have been unsuccessful.
The evidence most favorable to the trial court's finding establishes that J.Q. had a history of drug and alcohol abuse, that she admitted being a teenage alcoholic, that she admitted she abused "acid" and marijuana starting in November 1979, for about a five month period, that she also abused alcohol during the same five month period of time, that she voluntarily admitted herself to a drug and alcohol rehabilitation program in Denver for several months in 1980, and that she had gotten drunk or "tuned-up" on at least one occasion after the habeas corpus hearing. A court on appeal may not set aside the findings or judgment of the trial court unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. T.R. 52(A) The record supports the trial court's finding.
In her next contention, J.Q. argues that the trial court failed to properly apply the standards of the ICWA in determining the best interests of the child. Section 1912(f) of the ICWA provides:
No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.
J.Q. claims that the trial court did not require proof beyond a reasonable doubt that the return of the child would result in serious emotional or physical harm to the child, but rather that the trial court applied a much lesser standard by finding that the adoptive parents would provide a stable and consistent environment and that removal from them at this time would be traumatic and cause serious emotional harm to the child. The trial court determined:
6... . that since the placement of [the child] with [the adoptive parents], [J.Q.] has had in no way any contact with the child, meaningful communication, or in any way supported the child, that [J.Q.] has admitted to having various personal problems including being twice divorced from [the putative father] who is currently in jail, that she has had drug and alcohol problems, suicidal tendencies and that her four older children have been with her off and on during such personal problems and at times she has lived in a car and motels, and that it was in the best interests of [the child] to remain with [the adoptive parents]... .
* * * * * *
14. The adoption of [the child] by [the adoptive parents] is in the best interests of [the child] in that the [adoptive parents] will provide a stable and consistent environment and that removal from them at this time would be traumatic and cause serious emotional harm to [the child].
The evidence, including testimony from qualified expert witnesses, supports beyond a reasonable doubt the trial court's determination that removal of the child from her current home environment and placement with J.Q. would likely result in serious emotional harm to the child.
The trial court found that Dr. John Harris, Larry Salloway, and Irene Yankauskas qualified as expert witnesses. The three qualified experts testified that J.Q.'s past record of behavioral conduct would likely continue and under such continuing circumstances, J.Q.'s child-rearing capabilities *311 would be affected and would likely result in serious emotional or physical harm to the child. The phrase "qualified expert witness" is not defined in the ICWA, but legislative history reveals that it is "meant to apply to expertise beyond the normal social worker qualifications." H.R. No. 95-1386, 95th Cong., 2d Sess. 22 (1978), reprinted in 1978 U.S.Code Cong. & Admin.News 7530, 7545. The Bureau of Indian Affairs of the Department of the Interior has also defined the phrase in 44 Fed. Reg. 67,583, 67,593 (1979) as follows:
(b) Persons with the following characteristics are most likely to meet the requirements for a qualified expert witness for purposes of Indian child custody proceedings;
(i) A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and childrearing practices.
(ii) A lay expert witness having substantial experience in the delivery of child and family services to Indians, and extensive knowledge of prevailing social and cultural standards and childrearing practices within the Indian child's tribe.
(iii) A professional person having substantial education and experience in the area of his or her specialty.
Dr. John Harris has a Ph.D. in clinical and experimental psychology; has been a clinical psychologist for 17 years; and a university professor for 13 years. Larry Salloway is an enrolled member of the Rosebud Sioux Tribe, which borders the Pine Ridge Reservation; he lived on the Pine Ridge Reservation for a number of years and travels to Pine Ridge at least once a month; he is employed as a Juvenile Judge of the Rosebud Sioux Tribe; and he has served as a tribal attorney and a juvenile court counselor. Irene Yankauskas is a social worker with her Bachelor's degree; 58-60 hours of graduate work of which 24-28 hours is in psychology and sociology; she has accumulated all but six hours toward her masters degree in special education; and she has been emplayed for the past 4 and 1/2 years by the Porter County Welfare Department as a child protective service worker during which time she has been involved in over a thousand cases involving the investigation of child abuse and neglect. The record sufficiently supports the finding that all three of these witnesses meet at least one of the three guidelines as set out above for determining "qualified expert witnesses."
J.Q. claims that the trial court improperly applied the standard "best interests of the child" as required by the ICWA. The legislative history recognizes that the "legal principle is vague, at best" and that "judges too may find it difficult, in utilizing vague standards like `best interests of the child,' to avoid decisions resting on subjective values." H.R. No. 95-1386, 95th Cong., 2d Sess. 19 (1978), reprinted in 1978 U.S.Code Cong. & Admin.News 7530, 7542. It is J.Q.'s contention that the trial court failed to apply the presumption that the best interest of the child is served by preventing removal from the Indian family and culture and that the court improperly considered such items as poverty, alcoholism, and parenting customs, all in violation of specific provisions of the ICWA. 25 U.S.C. § 1915(d).
The ICWA, under § 1915(a), requires the trial judge to give preference of placement, absent good cause to the contrary, to members of the child's extended family, other members of the Indian child's tribe, or other Indian families. J.Q. claims that the trial court gave insufficient weight to the mandate that Indian children should be raised in Indian homes, pursuant to § 1915 (placement preference) and § 1902 (declaration of policy). The term "good cause" is not defined for purposes of § 1915. Legislative history states explicitly that the use of the term "good cause" was designed to provide state courts with flexibility in determining the disposition of a placement proceeding involving an Indian child. Primary responsibility for interpreting the language of the statute rests with the courts deciding the custody proceedings of Indian children. See supra note 3. Hence, we review this only for an abuse of discretion.
*312 We observe that the record is silent as to any custodian other than J.Q. who meet the criteria of § 1915, and who is willing to care for the child. We find that the record amply supports the trial court's finding that the "best interests of the child" were best served by granting the adoption petition based not only on the bonding which had occurred between the child and the adoptive parents, but also on the serious emotional or physical harm which would likely result if the child was returned to J.Q. The trial court did not abuse its discretion. We find that the evidence demonstrates beyond a reasonable doubt that transfer of custody to J.Q. would be likely to result in serious emotional or physical damage to the child.
Appellant J.Q. claims reversible error resulted when the trial court permitted a witness, Dr. John Harris, psychologist, to answer the following hypothetical question over J.Q.'s timely objection:
Ques: Now Doctor, I want to ask you a question that is rather lengthy, so I would like for you to listen rather carefully. Assume that [J.Q.] is the natural mother of [the child], who [sic] you observed.
Answer: Yes.
Ques: That [J.Q.] is approximately thirty-four years of age; that she has had seven children; that she voluntarily gave up one of her children for adoption in the early 1970's; that several other of her children were in foster care while she was in drug treatment in 1980 for a period of at least several months; that she had been abusing or was addicted to alcohol beginning at age fifteen or thereabouts, and was addicted to drugs, acide [sic] and marijuana, in 1979; that she was married to [her former husband] in 1971 and divorced from him in 1972 and then remarried him in 1974 and divorced him again in 1980; that [her former husband] was also addicted to alcohol; that [her former husband] physically abused her throughout the course of their two marriages, that sometimes in front of the children; that [her former husband] has been in and out of jail and, in fact, is in prison now serving a sentenced [sic] term for assaulting a police officer; that [J.Q.] also was in jail at least nineteen times, some while she had custody of her children, as recently as 1980; that she tried to commit suicide on at least four occasions, the last time being as late as 1981; that [J.Q.] has frequently moved during the time that she has had her children in her care, at least ten times in the past ten years, sometimes as often as every five or six months; that she and three of her children lived in a car for at least a week in late May and early June of 1981 when [J.Q.] was nearly nine months pregnant with [the child]. Based on those facts, do you have an opinion, Doctor, as to whether or not [J.Q.'s] custody of [the child] on a continual basis in this type of environment would likely cause [the child] to suffer serious emotional or physical damage?
Appellant argues that the hypothetical contained misstatements including, for example, that while J.Q. said she used drugs, she never admitted being addicted; J.Q. admitted to having been in jail fifteen times, not nineteen; she admitted to only three suicide attempts, not four; that the hypothetical is based upon past rather than current behavior; etc.
Resolution of this issue is guided by the following language from Weinstock v. Ott (1983), Ind. App., 444 N.E.2d 1227, 1230-31:
The trial judge did not err in allowing the hypothetical question to be answered. Weinstock is correct that ordinarily an expert witness should not be allowed to answer a hypothetical question which assumes facts unsupported by the evidence or reasonable inferences therefrom. [citations omitted] This requirement guards against the trier of fact adopting an expert's opinion which is based on false or inapplicable facts. [citations omitted] However, here this safeguard is not needed.
The hypothetical question was asked during a voir dire examination outside of the jury's presence. This examination was conducted so that the trial judge could determine whether Dr. Zarins was competent to testify as an expert medical *313 witness. Because of the trial judge's legal experience and expertise regarding the rules of evidence, we presume that he was able to hear the hypothetical question and its answer, then subsequently determine if enough evidence had been admitted to support the facts which the hypothetical assumed. [citations omitted]
The same reasoning is applicable in the present case. No jury was involved, and we presume that the trial judge was able to determine whether the evidence presented sufficient facts to support the hypothetical question and its answer. Thus, no reversible error is shown.
With respect to appellant's contention that the Porter Circuit Court violated 25 U.S.C. § 1914 by failing to invalidate the adoption decree because of alleged violations of §§ 1911, 1912, and 1913 of the ICWA, we determine elsewhere in this opinion both that the ICWA is not applicable, and that, even if applicable, said sections were not violated by the trial court.
Appellant also asserts that the adoptive placement here granted violated the placement provisions of § 1915 of the ICWA because § 1915(c) provides that the tribal placement preference must be followed, the adoptive parents are not Indian, and the Oglala Sioux tribal code prohibits the adoption of a tribal member by a non-Indian family. To the extent that § 1915(c) applies to adoptive placements of an Indian child under state law, the statutory deference to be accorded the Tribe's order of preference applies only "in the absence of good cause to the contrary." 25 U.S.C. § 1915(a). Because of our determination that the evidence clearly demonstrated good cause to the contrary, we conclude that the adoptive placement preferences, including established tribal preferences, are not binding under the facts of this case. Thus, the trial court did not err in failing to follow the preferences for adoptive placement under § 1915 in this case. Cf. In re Maricopa County, supra (no abuse of discretion in the decision of the trial court declining to follow the preferences for adoptive placement).
Appellant claims that the evidence was insufficient to support the trial court's findings of fact with respect to the child's paternity. We disagree. The record contains testimony of numerous occasions in which J.Q. stated to various others that the former husband was not the father of the child. Furthermore, J.Q.'s petition for divorce was filed ten months before the divorce was granted, and the divorce decree was devoid of any mention of J.Q.'s pregnancy or the paternity of the fetus. The trial court was not required to accept J.Q.'s subsequent contrary assertions. The evidence was sufficient to support his findings.
Appellant contends that the trial court erred in failing to dismiss the adoption petition due to lack of notice and service upon her former husband as the alleged father of the child. J.Q. filed for divorce on January 24, 1980, the divorce was granted November 14, 1980, and the child was born June 14, 1981. The adoption petition was filed September 22, 1982. On May 26, 1983, the trial court received the following letter from the former husband:
Your Honor,
I would like to bring to your attention that I have not as yet received a notice of the hearings concerning my baby, [TRM]. I have not consented to this adoption and would like an attorney appointed on my behalf.
The trial court appointed counsel to represent the former husband's interests on May 31, 1983.
At the hearing on the adoption proceeding on September 29, 1983, the appointed attorney moved to withdraw her appearance on behalf of the former husband. The court granted the motion finding there had been no meaningful contact with the client. In the Order of Adoption, the trial court made the following finding:
Although [the former husband] ... was represented by counsel Joanne Tapocsi until the hearing date of September 29, 1983, at which time this Court allowed Mrs. Tapocsi to withdraw her appearance, after that September 29, 1983, hearing Mrs. Tapocsi wrote to [the former *314 husband] at the last address given her. Said letter has not been returned at the date of the completion hearing on October 19, 1983, although Mrs. Tapocsi informed [the former husband] that she had withdrawn and that the hearing was continued until October 19, 1983.
It is clear that the former husband had actual notice of the proceedings, and was further represented by counsel who was duly aware of and participating in the proceedings with access to all the pleadings, documents, etc., in her representation of him. Moreover, the former husband is not a party to this appeal and has not taken any appeal from the trial court's order granting the adoption of the child, notwithstanding the absence of his express consent. We thus decline to find error, not only because the trial court correctly determined from the evidence that the child's paternity had not been established and that there was insufficient evidence of the claims that the former husband was the biological father of the child, but also because the former husband had actual knowledge of the proceedings, received appointed counsel, and has failed to take an appeal. We reject appellant's argument that the adoption is void due to lack of jurisdiction and denial of due process resulting from alleged lack of notice and service upon the husband.
The evidence which J.Q. contends clearly supports her claim that the former husband is the biological father includes a rebuttable presumption of legitimacy according to South Dakota law and tribal law, her own testimony, and the former husband's acknowledgement by affidavit filed with the tribal court over two years after the child was born and by two letters he sent to the trial court. While such evidence does raise a presumption, the trial court heard the testimony and observed the witness' demeanor and found that such presumption was rebutted by the strong evidence to the contrary. We will neither reweigh the evidence nor judge the credibility of the witnesses on review. The record supports the trial court's finding by clear and convincing evidence and we find no error.
Appellant J.Q. contends that the trial court erred in finding abandonment of the child by J.Q. Appellant argues that the trial court incorrectly applied South Dakota rather than Indiana law to find abandonment. We find that the trial court's conclusion of abandonment was proper under the laws of both states. The record is sufficient to support the trial court's finding that J.Q. not only intended to, but did in fact abandon the child by relinquishing all parental responsibility and physical control of the child to the adoptive mother. In addition to the trial court's proper finding of abandonment under South Dakota law, we further find that the evidence supports a finding of abandonment under the standards of Ind. Code § 31-3-1-6(g), dispensing with the requirement of parental consent for adoption in the case of abandonment.
Appellant contends that the trial court violated her due process rights by failing to appoint counsel in the appeal of the habeas corpus action. J.Q. had been represented by South Dakota counsel during the habeas corpus proceedings. The trial court entered its order in the habeas action on October 21, 1982. On November 1, 1982, J.Q., by her private counsel, filed in the adoption cause a letter requesting the trial court appoint indigent counsel for herself and the former husband in the adoption proceeding under 25 U.S.C. § 1912(b).
The trial court found that indigency had not properly been proven and denied the request. There was nothing in the letter indicating that J.Q.'s private counsel intended to withdraw from representing her in the habeas corpus case, or that she would fail to comply with state law regarding the perfection of a timely appeal. J.Q.'s right to file a timely appeal did not expire until December 20, 1982. There was nothing filed in either the habeas action or the adoption action to make the trial court aware that J.Q.'s attorney would not fulfill her continuing duty to represent her client's interests in the habeas action. Subsequent failure to perfect an appeal regarding issues determined in the habeas corpus *315 proceeding was not the result of the trial court's denial of appointment of counsel in the adoption proceedings. The trial court did not violate J.Q.'s due process rights and we find no error.
Appellant J.Q. further contends that the trial court's order of adoption was contrary to the consent requirements of Ind. Code § 31-3-1-3, which provides in pertinent part:
Except in the case of a child sought to be adopted by a step parent, a child sought to be adopted by a blood relative, or a child received by the proposed adopting parent or parents from an agency without the state with the written consent of the state department of public welfare, or where the court in its discretion after a hearing held upon proper notice has waived the requirement for prior written approval, no child shall be placed in a proposed adoptive home without prior written approval of such placement by a duly-licensed child placing agency or county department of public welfare, which agency or county department shall be approved for such purpose by the state department of public welfare. Such approval shall be filed along with the petition for adoption.
Ind. Code § 31-3-1-8(d) refers to the necessity of a "proper consent, if any be necessary, to the adoption" as prerequisite to a decree of adoption. Appellant contends that these two statutes required that the adoption petition be accompanied with a consent for placement from the state or county department of public welfare or the trial court. We disagree. The consent requirements of Ind. Code § 31-3-1-8(d) refer to the consents prescribed by Ind. Code § 31-3-1-6. The provisions of Ind. Code § 31-3-1-3 would require prior written agency or welfare department approval prior to placement of a child in a proposed adoptive home. The statute applies to preadoption placement, but it does not constitute a jurisdictional prerequisite to the granting of the final adoption. Stout v. Tippecanoe County Dep't of Pub. Welfare (1979), 182 Ind. App. 404, 414-16, 395 N.E.2d 444, 451-52.
In addition, appellant contends that the trial court erred in considering the county welfare department report as evidence. The report's finding of fact 16 provided:
Porter County Department of Public Welfare has made an investigation as to the home of the [adoptive parents] pursuant to statute and have recommended that this adoption take place.
We view this finding of fact as significant only to show satisfaction of the procedural requirements of Ind. Code § 31-3-1-4, requiring the filing of a written report by a specified social service agency. The trial court's reference to the fact of approval by the agency cannot be viewed as harmful error in light of the clear and overwhelming specific evidence otherwise supporting the granting of the adoption.
Appellant J.Q. also asserts the alternative argument that the Uniform Child Custody Jurisdiction Act (Uniform Act), Ind. Code § 31-1-11.6-1 et seq, controls and the trial court had no subject matter jurisdiction over this case. This argument is unpersuasive for at least two reasons. First, to the extent that the Uniform Act requires deference to proceedings in other states, the word "state" is defined to mean "any state, territory, or possession of the United States, the commonwealth of Puerto Rico, and the District of Columbia." Ind. Code § 31-1-11.6-2(10). Neither the Reservation nor the Oglala Sioux Tribal Court is within the ambit of this definition in the Uniform Act. Second, even if we were to consider the tribal court proceedings as equivalent to those of another state, the Porter Circuit Court was properly vested with jurisdiction because the facts in the record demonstrate that Indiana was the "home state" of the child under the provisions of the Uniform Act. This is not a situation in which the adoptive parents wrongfully took the child from another state or improperly retained possession after temporary relinquishment of physical custody. We likewise reject appellant's argument that the Oglala Tribal Court had continuing jurisdiction by reason of its prior divorce proceedings involving J.Q. and *316 her former husband. Because the tribal divorce court failed to recognize the minor child as a child of the marriage and made no provisions with respect to the child's custody, support, or otherwise, the tribal divorce proceeding clearly had not exercised any prior jurisdiction with respect to the minor child.
In her final contention, J.Q. contends, in the alternative, that even if her alleged errors are individually found harmless by this Court, the cumulative effect thereof was to deny her a fair trial. We disagree. Notwithstanding the thorough discussion and forceful argument presented on behalf of appellant, we decline her request that we vacate the adoption decree and to order the proceedings transferred to the Oglala Sioux Tribal Court.

Conclusion
The decision of the Court of Appeals is vacated and the trial court's judgment is affirmed.
SHEPARD, C.J., and DeBRULER, GIVAN and PIVARNIK, JJ., concur.
NOTES
[1] The Tenth Amendment to the United States Constitution provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively or to the people." Notwithstanding Justice Brennan's recent comment in South Carolina v. Baker (1988), 485 U.S. ___, ___, 108 S.Ct. 1355, 1360, 99 L.Ed.2d 592, 602 ("The Tenth Amendment limits on Congress' authority ... are structural, not substantive  i.e., th[e] States must find their protection from congressional regulation through the national political process, not through judicially defined spheres of unregulable state activity.") and Justice Stone's comment in United States v. Darby (1941), 312 U.S. 100, 124, 61 S.Ct. 451, 462, 85 L.Ed. 609, 622 ("The amendment states but a truism that all is retained which has not been surrendered."), we feel the Tenth Amendment does and should continue to retain some real vitality. As did Justice O'Connor in her dissent to South Carolina v. Baker, 485 U.S. at ___, 108 S.Ct. at 1372, 99 L.Ed.2d at 616, we agree with Professor Tribe's observation: "Of course, no one expects Congress to obliterate the states, at least in one fell swoop. If there is any danger, it lies in the tyranny of small decisions  in the prospect that Congress will nibble away at state sovereignty, bit by bit, until someday essentially nothing is left but a gutted shell." L.Tribe, American Constitutional Law 381 (2d ed. 1988). Although we observe in the first sentence of our opinion that "[t]he power of state courts to conduct adoption proceedings involving children of Indian ancestry may be subject to significant limitations under the [ICWA]," we are acutely aware that the Supreme Court has not yet addressed the constitutionality of the ICWA under the Tenth Amendment or general principles of federalism. In the legislative history to the ICWA, there appears a letter to the committee chairmen from the Department of Justice regarding constitutional questions surrounding the ICWA. The letter provides in part:

A third and more serious constitutional question is, we think, raised by section 102 of the House draft. That section, taken together with sections 103 and 104, deals generally with the handling of custody proceedings involving Indian children by State courts. Section 102 establishes a fairly detailed set of procedures and substantive standards which State courts would be required to follow in adjudicating the placement of an Indian child as defined by section 4(4) of the House draft.
As we understand section 102, it would, for example, impose these detailed procedures on a New York State court sitting in Manhattan where that court was adjudicating the custody of an Indian child and even though the procedures otherwise applicable in this State-court proceeding were constitutionally sufficient. While we think that Congress might impose such requirements on State courts exercising jurisdiction over reservation Indians pursuant to Public Law 83-280, we are not convinced that Congress' power to control the incidents of such litigation involving nonreservation Indian children and parents pursuant to the Indian commerce clause [United States Constitution Article 1, Section 8] is sufficient to override the significant State interest in regulating the procedure to be followed by its courts in exercising State jurisdiction over what is a traditionally State matter. It seems to us that the Federal interest in the off-reservation context is so attenuated that the 10th Amendment and general principles of federalism preclude the wholesale invasion of State power contemplated by section 102. See Hart, "The Relations Between State and Federal Law," 54 Colum.L.Rev. 489, 508 (1954).
H.R. No. 95-1386, 95th Cong., 2d Sess. 39-40 (1978), reprinted in 1978 U.S.Code Cong. & Admin.News 7530, 7562-63. We deem it of no small significance, as is seen in the later discussion of this opinion, that the child was never domiciled on the reservation and that J.Q. was domiciled in Hot Springs, South Dakota at the time of the child's birth.
However, because we decide in this case that the ICWA does not apply and that aside from that conclusion J.Q.'s arguments are without merit, we shall not concern ourselves further with questions of the ICWA's constitutionality.
[2] We note that the ICWA does not expressly determine how domicile is to be established. However, the guidelines propounded by the Bureau of Indian Affairs of the Department of the Interior for implementing the ICWA state that "definitions [of domicile] were not included [in the ICWA or the guidelines] because these terms are well defined under existing state law. There is no indication that these state law definitions tend to undermine in any way the purposes of the Act." 44 Fed.Reg. 67,583, 67,585 (1979).
[3] This fact is conceded by the Bureau of Indian Affairs of the Department of the Interior in the introduction to the guidelines for interpretation of the ICWA:

Although the rulemaking procedures of the Administrative Procedure Act have been followed in developing these guidelines, they are not published as regulations because they are not intended to have binding legislative effect... . Primary responsibility for interpreting ... language used in the [ICWA, other than that delegated expressly to the Secretary of the Interior,] ... rests with the courts that decide Indian child custody cases."
44 Fed.Reg. 67,583, 67,584 (1979).