In re the ADOPTION OF D.C.[1]

J.C., Appellant,

v.

J.C. and A.C., Appellees.

No. 49A02–0909–CV–862.

Court of Appeals of Indiana.

June 9, 2010.

1. Some documents on appeal are captioned "Adoption of J.C. et al." Because the trial court dismissed the adoption petition as to J.C., we caption the case to identify the minor who is the subject of the appealed order.

Ryan H. Cassman, Hollingsworth & Zivitz, P.C., Carmel, IN, Attorney for Appellant.

Audrey K. Grossman, Monty K. Woolsey, Cross, Woolsey & Glazier, Indianapolis, IN, Attorneys for Appellees.

Marryn Gluys, Neighborhood Christian Legal Clinic, Indianapolis, IN, Attorneys for Amicus Curiae Sitka Tribe of Alaska.

**2.** I.C.'s first and last names were later changed after it was determined that Stepfather was her biological father.

**3.** The November 1998 dissolution decree required Biological Father to pay child support only for the eldest child. Because the middle

David Avraham Voluck, Sitka, AL, Temporary Admission.

## OPINION

BAILEY, Judge.

### Case Summary

J.C. ("Biological Father") appeals an order of the Marion Superior Court, Probate Division, granting the petition of J.C. ("Stepfather") and his wife, A.C. (collectively "Adoptive Parents"), to adopt eleven-year-old D.C., who has lived with Stepfather since his birth. We affirm.

### Issues

Biological Father presents three issues for review:

I. Whether his parental rights may not be terminated absent the procedural protections of the Indian Child Welfare Act;

II. Whether the probate court clearly erred in finding that Biological Father's consent to adoption is unnecessary; and

III. Whether the probate court's finding that adoption is in the best interests of D.C. is clearly erroneous.

### Facts and Procedural History

Biological Father was previously married to S.C., who gave birth to three children during the marriage: J.C., born November 14, 1993, I.C.,[2] born September 15, 1996, and D.C., born May 5, 1998. Biological Father and S.C. separated before D.C.'s birth; they later divorced and S.C. married Stepfather.[3] Stepfather is the bi-

child was the biological child of Stepfather, no child support was ordered on her behalf. Because the paternity of the youngest child was not yet established, the dissolution decree was silent as to financial responsibility for him. In 2003, Biological Father was ordered

ological father of S.C.'s middle child, and Biological Father is the father of S.C.'s eldest and youngest children. S.C. and Stepfather had custody of all the children until S.C.'s death in 2005.

A few months prior to S.C.'s death, Stepfather petitioned to adopt J.C. and D.C., alleging that Biological Father's consent was not required, due to his failure to communicate significantly with the children and provide support, according to Indiana Code Section 31–19–9–8(a)(2)(A)– (B). S.C.'s notarized consent was attached to the adoption petition. On April 4, 2005, Biological Father filed his motion contesting the adoption. He alleged that the children were subject to the Indian Child Welfare Act of 1978, 25 U.S.C. §§ 1901– 1963 (1982) ("the ICWA") and further asserted that he had not failed to communicate significantly with or support the children.[4]

Stepfather remarried and his wife joined in the petition for adoption. The probate court conducted a series of hearings. The Sitka Tribe of Alaska was permitted to intervene, and evidence and arguments were heard regarding the potential application of the ICWA. The representative of the Sitka Tribe argued that the ICWA was applicable, but advised the probate court that transfer of jurisdiction was not being sought because the children were domiciled outside Alaska. On May 10, 2007, the probate court found the ICWA inapplicable because the proposed adoption would not cause a removal from an Indian home.

Next, the probate court conducted a hearing on the issue of whether Biological Father's consent to adoption was required. On July 14, 2008, the probate court issued an order declaring that Biological Father's

consent was not required and setting a hearing date to address the best interests of the children.

Prior to the final hearing, J.C., then age fifteen, went to live with Biological Father. Biological Father moved to dismiss the adoption petition as to J.C. and, on January 30, 2009, that motion was granted. On May 29, 2009, the probate court conducted a hearing regarding the pending adoption petition as to D.C. On June 29, 2009, the probate court issued its Findings of Fact, Conclusions of Law and Order granting the Adoptive Parents petition to adopt D.C. The order also included provisions for sibling visitation, with J.C. to visit her siblings in Indiana and D.C. to visit J.C. at Biological Father's home in Alaska. The order also provided for unlimited and unmonitored telephonic visitation between D.C., J.C., and Biological Father. This appeal ensued.

## Discussion and Decision

### I.A. Standard of Review

We will disturb the ruling of a probate court in an adoption case only where the evidence leads to a single conclusion and the probate court reached an opposite conclusion. In re Adoption of H.N.P.G., 878 N.E.2d 900, 903 (Ind.Ct.App.2008), trans. denied, cert. denied, —— U.S. ——, 129 S.Ct. 619, 172 L.Ed.2d 460 (2008). We will not reweigh the evidence but will examine the evidence most favorable to the probate court's decision together with reasonable inferences drawn therefrom to determine whether sufficient evidence exists to sustain the decision. In re Adoption of A.S., 912 N.E.2d 840, 851 (Ind.Ct.App.2009), trans. denied.

---

to pay child support for the youngest child, D.C.

4. Biological Father initially requested a transfer of jurisdiction to the tribal council court, but later withdrew that request. (Tr. 8.)

■ The probate court, at a party's request may enter findings of fact and conclusions of law pursuant to Indiana Trial Rule 52(A). *Id.* In that case, we employ a two-tiered standard of review: we determine whether the evidence supports the findings and whether the findings support the judgment. *Id.* We will set aside the findings or judgment only if they are clearly erroneous. *Id.* Findings of fact are clearly erroneous if the record is devoid of any evidence or reasonable inferences to support them, while a judgment is clearly erroneous when it is unsupported by the findings of fact and the conclusions relying on those findings. *Id.*

### I.B. Analysis—ICWA

■ Biological Father presented evidence that he had recently become an enrolled member of the Sitka Tribe of Alaska with a Tribe Degree of 1/16th. He has enrolled J.C., with a Tribe Degree of 1/32nd. Presumably, D.C. would be eligible for enrollment upon presentation of required documentation. Biological Father sought the procedural protections of the ICWA applicable in termination proceedings,[5] while not formally seeking a transfer of jurisdiction to a tribal council.

The probate court found the ICWA to be inapplicable here because there was no "removal" from custody within an Indian family as contemplated by 25 U.S.C. § 1902 and § 1912(f), providing as follows:

> The Congress hereby declares that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the *removal* of Indian children from

their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs. No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the *continued custody* of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

(emphasis added.) Biological Father concedes that our Indiana Supreme Court has construed the ICWA as "applicable when you have Indian children being removed from their existing Indian environment." *Matter of Adoption of T.R.M.*, 525 N.E.2d 298, 303 (Ind.1988), *cert. denied*, 490 U.S. 1069, 109 S.Ct. 2072, 104 L.Ed.2d 636 (1989). He nonetheless requests that we "overturn the existing Indian family doctrine." Appellant's Brief at 8. It is not within our province to do so. *See Liberty Mut. Ins. Co. v. OSI Indus., Inc.*, 831 N.E.2d 192, 205 (Ind.Ct.App.2005) (observing that "we may not overrule the decisions of our supreme court."), *trans. denied.*

Alternatively, Biological Father argues that he, J.C. and D.C. constitute an existing Indian family because of his and J.C.'s tribal enrollment and D.C.'s eligibility for enrollment. The probate court's conclusion concerning removal is supported by factual findings that D.C. has never lived with Biological Father and thus has never lived in an Indian home from which he could be removed. Biological Father's ar-

---

**5.** Specifically, Section 1912(f) of the ICWA requires that a termination of parental rights be supported by evidence beyond a reasonable doubt, as opposed to clear and convinc-

ing evidence. The statutory provision also requires the testimony of qualified expert witnesses.

gument is merely an invitation to reweigh the evidence, which we cannot do. *In re A.S.*, 912 N.E.2d at 851.

## II. Necessity of Consent

■ Biological Father next challenges the probate court's determination that his consent to D.C.'s adoption is not required. Indiana Code Section 31–19–11–1 provides that the trial court "shall grant the petition for adoption and enter an adoption decree" if the court hears evidence and finds, in part, that "the adoption requested is in the best interest of the child" and "proper consent, if consent is necessary, to the adoption has been given."

According to Indiana Code Section 31–19–9–8(a):

> Consent to adoption, which may be required under section 1 of this chapter, is not required from any of the following:
> * * * * * *
> (2) A parent of a child in the custody of another person if for a period of at least one (1) year the parent:
> (A) fails without justifiable cause to communicate significantly with the child when able to do so; or
> (B) knowingly fails to provide for the care and support of the child when able to do so as required by law or judicial decree.

■ Accordingly, the Adoptive Parents were required to prove by clear and convincing evidence that Biological Father's consent was not required. *See In re Adoption of M.A.S.*, 815 N.E.2d 216, 219 (Ind.Ct.App.2004). The trial court concluded that the necessity of obtaining Biological Father's consent to the adoption was obviated on grounds that he failed to provide support when able to do so. The provisions of Indiana Code Section 31–19–9–8 are disjunctive; as such, either pro-

vides independent grounds for dispensing with parental consent. *In re Adoption of T.W.*, 859 N.E.2d 1215, 1218 (Ind.Ct.App. 2006).

At a time when the adoption petition was pending as to both J.C. and D.C., the probate court found that there were separate court orders requiring Biological Father to pay child support for J.C. and D.C. In 1998, he was ordered to pay $230.00 per month for J.C.; in 2003, he was ordered to pay $322.78 per month for D.C. The probate court found that, from Biological Father's income of $23,430.00, "no more than $500" had been paid on behalf of both children in the twelve months preceding the adoption petition, and characterized the aggregate amount as "token payments." (App. 42.) It consisted of $279.99 from a Navy pension and two checks amounting to $220.

The evidence of record indicates that, when he was in the Navy and not subject to a support order with regard to D.C., Biological Father had signed an allotment for J.C.'s benefit. Accordingly, in 2004, when Biological Father was entitled to a Navy pension, $279.99 was withheld and forwarded to his ex-wife. There is no evidence of an allotment or garnishment established to benefit D.C. With regard to the checks that Biological Father sent to his ex-wife during 2004, $70 was designated for J.C. and $150 was designated for clothes.

As to D.C. in particular, there is at most evidence that he may have benefited from the check for clothing. There is no showing that Biological Father made any single conforming child support payment for D.C.'s benefit during the year preceding the filing of the adoption petition, although a substantial child support arrearage had accrued.[6] Accordingly, the Adoptive Par-

---

**6.** By the time of the final hearing, Biological

Father's child support arrearage was approxi-

ents established, by clear and convincing evidence, that Biological Father failed to provide for D.C.'s care and support when able to do so.

### III. Best Interests

 Finally, we consider the probate court's determination that adoption was in D.C.'s best interests. The purpose of Indiana's adoption statutes is to protect and promote the welfare of children by providing them with stable family units. *In re Infant Girl W.*, 845 N.E.2d 229, 236 (Ind.Ct.App.2006), *trans. denied.* The best interests of the children are paramount. *Id.*

Stepfather cared for D.C., without interruption, throughout the eleven years preceding the adoption petition. Meanwhile, Biological Father had extremely limited contact with D.C. and accumulated a child support arrearage of tens of thousands of dollars. At all times prior to the filing of the instant petition, Biological Father acquiesced to Stepfather's custody of D.C.

By all accounts, D.C. is well-adjusted to his surroundings and bonded with his adoptive parents; Biological Father does not claim otherwise. Rather, he points to facial inconsistency in the order severing parental rights while at the same time permitting sibling visitation and unlimited telephonic visitation.[7] He contends that the findings and conclusions are so contradictory and internally inconsistent that the adoption decree must be reversed. Bio-

logical Father does not explain how he is prejudiced by the provisions for sibling visitation and telephonic communication. Essentially, he was relieved of future parental obligations as to D.C.[8] while he was afforded opportunities for contact. Indiana Trial Rule 61 provides in pertinent part:

> No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order in anything done or omitted by the court or by any of the parties is ground for granting relief under a motion to correct errors or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order or for reversal on appeal, unless refusal to take such action appears to the court inconsistent with substantial justice.

Accordingly, we will not reverse a judgment where the appellant has failed to demonstrate prejudice to his substantial rights.

Affirmed.

MAY, J., concurs.

BARNES, concurs with separate opinion.

BARNES, Judge, concurring.

Although I concur with the majority opinion, I write separately to note Indiana's minority position in applying the

---

mately $30,000 (for both children).

**7.** Indiana Code Section 31–19–16.5–1 permits the court entering an adoption decree to order the adoptive parents to provide specific post-adoption contact for an adopted child at least two years of age with a pre-adoptive sibling if (1) the court determines that such would serve the best interests of the adopted child and (2) each adoptive parent consents to the court's order for post-adoption contact privileges. Here, with the testimonial consent of the Adoptive Parents, the order speci-

fied that D.C.'s sibling visitation with J.C. was to take place in the home of Biological Father. The order also provided for unlimited telephonic visitation between D.C., J.C., and Biological Father, a gratuitous provision entered by the probate court and not challenged on cross-appeal by the Adoptive Parents.

**8.** We do not suggest that Biological Father is relieved of his obligation to make child support payments accrued prior to the instant proceedings.

"existing Indian family" doctrine. The ICWA was enacted in 1978 to:

> protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs.

25 U.S.C. § 1902. Four years after the statute was enacted, the Kansas appellate courts adopted the "existing Indian family" doctrine, which holds that the ICWA does not apply where the child was not in an "existing" Indian environment. *In re the Adoption of Baby Boy L.*, 231 Kan. 199, 643 P.2d 168 (1982), *overruled by In re A.J.S.*, 288 Kan. 429, 204 P.3d 543 (2009). Several other courts, including Indiana, adopted this approach to the ICWA. *See In re T.R.M.*, 525 N.E.2d 298 (Ind.1988), *cert. denied.*

In *T.R.M.*, an Indian mother gave her child to a non-Indian couple shortly after the child's birth so that the couple would adopt the baby. However, the mother later changed her mind about the adoption. Relying on *In re Adoption of Baby Boy D.*, 742 P.2d 1059 (Okla.1985), *cert. denied,* our supreme court held:

> In the case before us, the child's biological ancestry is Indian. However, except for the first five days after birth, her entire life of seven years to date has been spent with her non-Indian adoptive parents in a non-Indian culture. While the purpose of the ICWA is to protect Indian children from improper removal from their existing Indian family units, such purpose cannot be served in the present

case before this Court. From the unique facts of this case, where the child was abandoned to the adoptive mother essentially at the earliest practical moment after childbirth and initial hospital care, we cannot discern how the subsequent adoption proceeding constituted a "breakup of the Indian family." We therefore hold that, separate from and independent of our consideration of the merits of appellant's specific issues, the ICWA should not be applied to the present case in which the purpose and intent of Congress cannot be achieved thereby.

*T.R.M.*, 525 N.E.2d at 303. However, *Baby Boy D.*, upon which our supreme court relied, has since been overruled by *In the Matter of Baby Boy L.*, 103 P.3d 1099, 1108 (Okla.2004), which held that the existing Indian family doctrine was "no longer a viable doctrine" in Oklahoma.

In fact, the validity of the existing Indian family doctrine has repeatedly been called into question, and many courts have now abandoned the doctrine. *See A.J.S.*, 204 P.3d at 549 (holding that "abandonment of the existing Indian family doctrine is the wisest future course"); *see generally* Vento, Carol Schultz, *Construction and Application of Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C.A. §§ 1901 et seq.) Upon Child Custody Determinations,* 89 A.L.R.5th 195 (2001); Suzanne D. Painter–Thorne, *One Step Forward, Two Giant Steps Back: How the "Existing Indian Family" Exception (Re)imposes Anglo American Legal Values on American Indian Tribes to the Detriment of Cultural Autonomy,* 33 Am. Indian L. Rev. 329 (2008–2009).

We do not have the authority to overrule our supreme court, and we must apply the existing Indian family doctrine in this case. However, given the controversy surrounding the existing Indian family doctrine, I

encourage our supreme court to revisit its applicability in Indiana.