[No. H001759. Sixth Dist. Apr. 21, 1988.]

In re ROBERT T., a Minor.
ROBERT WEIGLE, as Chief Probation Officer, etc., Petitioner and
Respondent, v.
DEVON T., Objector and Appellant.

658

COUNSEL

Frieda Jo Owings, under appointment by the Court of Appeal, for Objector and Appellant.

Donald L. Clark, County Counsel, and Diane L. Bennett, Deputy Coutny Counsel, for Petitioner and Respondent.

Leo Himmelsbach, District Attorney, and Robert J. Masterson, Deputy District Attorney, for Minor.

## OPINION

AGLIANO, P. J.—Devon T. appeals from an order and judgment terminating parental rights to her son, Robert, under Civil Code section 232, subdivisions (a)(1) and (a)(7). Robert was born to 15-year-old Devon on April 27, 1981. Mauricio M. (aka Mauricio A.), Robert's father, is of Mexican-American descent. Devon is of American Indian and Eskimo descent; both Devon and Robert are enrolled members of the Santo Domingo Tribe. Robert is thus an "Indian child" within the meaning of 25 United States Code section 1903(4), and this case falls under the aegis of the Indian Child Welfare Act (Act), 25 United States Code section 1901 et seq.

Devon alleges that the court failed to comply with certain provisions of the Act. Specifically, she claims it erred in refusing to grant the Santo Domingo Tribe's petition to transfer jurisdiction of the proceedings to the tribal court (25 U.S.C. § 1911(b)), and that the court's placement of Robert with his foster-adoptive parents violated 25 United States Code section 1915. We find no error and affirm.

The judgment and order terminating appellant's parental rights, from which this appeal arises, was filed on April 3, 1986. A brief chronicle of the preceding five years is relevant to the issues on appeal.

Devon and Mauricio became involved in a common law relationship in October 1979. This liaison, which never resulted in marriage, was to produce four children between April 1981 and September 1984. Social services had been provided both to Devon and to Robert's maternal grandmother, Vickie T., prior to Robert's birth, and Devon had been counseled on her need to complete her high school education. But after Robert's birth, although Devon agreed to improve her parenting skills and complete her education, she moved frequently and made little progress toward stabilizing her life.

At eight months, in December 1981, Robert was taken into protective custody after the police received a report that Mauricio had twice allowed him to fall from a car. A petition alleging that Robert came within the

provisions of Welfare and Institutions Code section 300, subdivision (a), based on Mauricio's abuse and on Devon's lack of support and housing, was filed on December 22. A combined jurisdictional and dispositional hearing was held on January 26, 1982. At the hearing, Devon admitted the allegations of the petition and Robert was made a dependent of the court. He was released to Devon's custody provided she live in the home of her father, that visitation by Mauricio be supervised and that the court be consulted prior to Devon and Robert's moving.

Devon moved with Robert without court approval on February 4, 1982, and for the next 11 months was apparently living on and off in the Fresno area with Mauricio. A Welfare and Institutions Code section 387 supplemental petition was filed on February 23, 1982, alleging the violation of the court's dispositional order, and on February 24, the court issued a warrant for Robert's custody.

On September 7, 1982, Devon gave birth to another son, Anthony T.

Despite the case worker's contrary recommendation, the warrant was ordered to remain in effect at the annual review hearing on December 9, 1982.

On December 15, 1982, Devon and Robert were the subject of a multidisciplinary team meeting which resulted in Robert's case being transferred to an American Indian social worker, Otto Trabue, on December 20, 1982. The team also recommended that the tribal council be notified of the dependency proceedings.

On January 18, 1983, Robert was placed in protective custody on the basis of the outstanding warrant. At the detention hearing on January 20, Robert was ordered placed in emergency foster care, and a jurisdictional hearing on the Welfare and Institutions Code section 387 petition was scheduled for February 9, 1983. Devon admitted the allegations of the supplemental petition at this hearing, and Robert was ordered to remain in foster care. Although the court considered transferring the case to Fresno County, Devon's residence there was never verified. On March 14, the court reaffirmed its previous orders.

On April 8, 1983, Robert was placed in a second foster home.

In a social report filed on May 19, 1983, Mr. Trabue informed the court that in accordance with 25 United States Code section 1912, he had notified the Santo Domingo Pueblo of the hearing originally scheduled for that date. In light of the continued instability of Devon's life, and of his concern for

the quality of Devon's care for Anthony T., Mr. Trabue recommended that Robert be freed for adoption. At the June 2 hearing, the court reiterated its previous orders.

Mr. Trabue also notified the tribe of the scheduled August 4, 1983, permanency planning hearing. In his court report of the same date, he related that Devon was now pregnant with her third child. He also related his discussions with Vickie T. concerning the possibility of her providing a home for Robert. In light of her alcohol-related problems, poor physical health, lack of independent housing and inability to provide a home to Devon and another daughter, Mr. Trabue concluded that it would be unsuitable to consider placing Robert with his maternal grandmother. On August 4 the court ordered the initiation of parental termination proceedings to free Robert for adoption.

On September 7 Robert was placed back in his original foster home. This same month, Devon gave birth to a third son, Mauricio T.

On November 11, 1983, Robert was moved to a foster-adoptive placement with the H's. They wish to adopt him.

The Welfare and Institutions Code section 366 dependency review hearing scheduled for January 12, 1984, was continued to January 19 to allow the tribe, which had been notified of the hearing on December 23 but had not received this notice until January 4, 10 days to respond. On January 17 Mr. Trabue notified the court that Devon, then 17, was pregnant with her fourth child.

The June 11, 1984, court report indicated that Robert was thriving in his foster-adoptive placement. A long-term ear infection had been resolved, a speech delay appeared to have been overcome, and he was a happy, healthy three year old. Devon, with her three younger sons, was currently seeking her fourth housing situation since the previous hearing.

On November 5, 1984, a Civil Code section 232 petition was filed alleging that under subdivisions (a)(1) and (a)(7), Robert should be freed from parental custody and control. A Civil Code section 233 report was filed on December 13, 1984. Devon was then residing with her three other children, Anthony, Mauricio and Danny, born in September 1984, at Unity House, a temporary emergency housing facility for American Indian families. Devon had visited Robert five times since his placement in foster care in January 1983. The report recommended that the petition be granted.

At a hearing on December 21, 1984, Mauricio's parental rights were terminated under Civil Code section 232, subdivision (a)(1), and the matter

was continued to January 11, 1985, for tribal intervention on Devon's behalf.

Hearings on the termination petition were held on April 24, May 22, June 4, 5, and 6, July 11, 26, and 29, September 16 and 19, October 9 and November 8, 1985. On January 27, 1986, the trial court filed a 54-page statement of decision, granting intervention, denying the petition to transfer jurisdiction to the tribal court, and granting the termination petition. A judgment and order consistent with this decision was filed on April 3. This appeal followed.

As another appellate court has noted, "[t]he [Indian Child Welfare] Act . . . was enacted '. . . to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, . . .' ([25 U.S.C.] § 1902.) The legislation was Congress' response to its findings that '. . . an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions; . . .' ([25 U.S.C.] § 1901, subd. (4); (see generally Barsh, *The Indian Child Welfare Act of 1978: A Critical Analysis* (1980) 31 Hastings L.J. 1287 . . . ; Note, *The Indian Child Welfare Act of 1978: Provisions and Policy* (1980) 25 San Diego L.Rev. 98.)" (*In re Junious M.* (1983) 144 Cal.App.3d 786, 789-790 [193 Cal.Rptr. 40].)

As in *Junious M., supra,* we are concerned here with subchapter I of the Act, which governs child custody proceedings. These are defined as proceedings for foster care placement, termination of parental rights, preadoptive placement, and adoptive placement. (25 U.S.C. § 1903(1).) A tribe has exclusive jurisdiction over child custody proceedings involving an Indian child who resides or is domiciled within its reservation. (25 U.S.C. § 1911(a).) For other Indian children who are the subject of child custody proceedings initiated in a state court, "the court, in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe." (25 U.S.C. § 1911(b).) Even for an Indian child who lives off the reservation, then, the tribal court is the preferred jurisdiction under the Act. But this preference can be overcome on a showing of "good cause."

Appellant first asks us to decide whether the state or the tribal court was the appropriate jurisdiction to decide whether Devon's parental rights to Robert should be terminated. To address this issue we turn, as did the

trial court, to the definition of "good cause" for nontransfer contained in the Guidelines for State Courts; Indian Child Custody Proceedings, 44 Federal Register 67584 et seq. (Nov. 26, 1979) (guidelines). Although the rulemaking procedures of the Administrative Procedures Act were followed in developing these guidelines, they were not published as regulations because they were not intended to have binding legislative effect. (*Id.* at p. 67584.) The guidelines represent the Department of Interior's interpretation of the Act, however, and are a useful aid in interpreting its provisions. (See, e.g., *Matter of J. L. H.* (S.D. 1980) 299 N.W.2d 812, 815.) In denying the petition to transfer, the trial court relied on section C.3., subsections (b)(i) and (iii) of the guidelines, which define good cause to include: "(i) The proceeding was at an advanced stage when the petition to transfer was received and the petitioner did not file the petition promptly after receiving notice of the hearing. . . . [¶] (iii) The evidence necessary to decide the case could not be adequately presented in the tribal court without undue hardship to the parties or the witnesses." (44 Fed.Reg., *supra,* at p. 67591.)

The introduction to the guidelines also notes that the legislative history of the Act "states explicitly that the use of the term 'good cause' was designed to provide state courts with flexibility in determining the disposition of a placement proceeding involving an Indian child. S.Rep. No. 95-597, 1st Sess., p. 17 (1977)." (*Id.* at p. 67584.)

Keeping these definitions in mind, we next review the record to determine whether substantial evidence supports the court's finding that good cause existed to deny the petition. (*In re Angelia P.* (1981) 28 Cal.3d 908, 924 [171 Cal.Rptr. 637, 623 P.2d 198].)

As grounds for denying transfer, the court found that the tribe had failed to promptly file a petition to transfer upon receiving notice of the termination hearing. A review of the record reveals that the termination petition was filed on November 5, 1984. The tribe had notice of these proceedings in November 1984 and discussed the possibility of intervening in December. The case was continued from December 21 to January 11, 1985. A letter from the tribe filed on January 11 expressed its intention to intervene and to request custody of Robert, who would be placed with his maternal great aunt and uncle on the pueblo in long-term foster placement "until such time [as] a more permanen[t] plan is made and [the] child is freed for adoption." Appended was a tribal court order making Robert a temporary ward of that court until he became free for adoption. These documents were submitted to the trial court at the January 11 hearing and were treated as a request for tribal intervention and transfer of jurisdiction.

The case was then continued to February 22, 1985, to allow the tribe to file a petition for transfer. A petition for intervention, filed on February 22,

1985, appears in the dependency file. The case was continued to March 6 and then to April 24 for the first hearing. A transfer petition was filed on that day. At this juncture the court decided that it was too late to delay trial on the termination petition and, with all parties concurring, received evidence on the transfer issue as well as on the termination petition.

The trial court observed that there was a five-month delay between notice of the termination proceedings and the tribe's filing of the transfer petition and on this basis found "good cause." While we tend to agree that "good cause" existed on that ground, we note delay of greater magnitude. The tribe had been given notice of all hearings in the dependency proceedings since July 21, 1983, six months after Robert was first placed in foster care. Despite this, it did not intervene or petition for transfer in those proceedings and, as we have already noted, did not indicate its interest in any of the state court proceedings until a year and a half later.

Albanita Atencio, the tribe's director of social services, testified that in the summer of 1983, Vickie T. had called the tribe requesting its support in her effort to have Robert placed with her. The tribe then contacted Devon, who told tribe officials that she intended to follow through with a treatment program in order to be reunited with Robert. Mrs. Atencio then spoke to Mr. Trabue about Vickie's ability to assume custody of Robert. Mr. Trabue relayed his concerns about Vickie's ability to assume this responsibility, after which the tribe apparently decided not to intervene on her behalf.

Mr. Trabue testified he sent a letter to the tribe on September 12, 1984, together with copies of the dependency petition, the probation officer's initial report, Mr. Trabue's most recent court report, and the minute order directing the filing of a termination petition. In his letter, he indicated that the case plan was to free Robert for adoption, and that he was prepared to submit the necessary documents to county counsel to implement this plan. Following this, Mr. Trabue spoke to the lieutenant governor of the tribe by telephone, and also told him at that time that Robert was in foster placement. Only after the tribe was notified of a scheduled termination hearing in December 1984, and Devon's maternal aunt had expressed interest in having custody of Robert, however, did the tribe decide to intervene. Mrs. Atencio testified "that is the way we usually just, you know, operate our system, just that we don't intervene until someone, a parent or grandparent, asks us to intervene. And then we do try to intervene."

The tribe argues with some reason that since the purpose of dependency proceedings is to reunify parents and children, it was legitimate for it to assume that the end result of Robert's dependency would be reunification with his mother. This belief was apparently encouraged by Devon's report

to Mrs. Atencio that she was cooperating with the reunification plan. If, however, as happened here, reunification efforts fail to successfully reunite a child with his or her parents within a year or 18 months (Welf. & Inst. Code, § 361.5) a court must adopt a permanent plan for a child. (§ 366.25.) If a child is likely to be adopted (§ 366.25, subd. (d)(2)), that plan is usually to commence termination proceedings to free the child for adoption. In this case, the tribe was notified in July 1983 of the scheduled August 1983 permanency planning hearing concerning Robert, who had been a dependent of the court since January 1982, and in out-of-home placement since January 1983. Robert was not placed with his foster-adoptive family, nor were termination proceedings ordered commenced, until November 1983, three months after the hearing at which the court concluded that the reunification efforts of the preceding 19 months had failed.

The significance of this chronology is obvious: the tribe's intervention came too late. Its decision to intervene, and to petition to transfer jurisdiction, was based on the expressed desire of Robert's extended family members to have Robert placed with them on the pueblo. This option was not seriously explored until over a year after termination proceedings had commenced, a year in which Robert had bonded to his foster-adoptive family.

We believe a timely request to transfer jurisdiction, although this determination must be made on a case-by-case basis, should at least precede permanency planning in the dependency proceedings. If the permanent plan for the dependent child is that he or she be freed for adoption, the probation department will in all likelihood initiate a search for a preadoptive placement. And once in a placement which both child and foster-adoptive family expect to become permanent, a bond will form. Its breaking may well injure the child. (See, e.g., *In re Micah S.* (1988) 198 Cal.App.3d 557, 566 [243 Cal.Rptr. 756] [Brauer, J. concurring].) Although the trial court cited language from the guidelines concerning the need for timeliness as a weapon against "disruption caused by negligence or obstructionist tactics on the part of counsel" (44 Fed.Reg., *supra,* at p. 67590) we believe the timeliness requirement reflects the Act's concern for the best interests of the Indian child. (25 U.S.C. § 1902.) While the tribal court is the preferred jurisdiction under the Act, the tribe cannot reasonably delay its request for transfer until after the child's adoptive family has been found. We therefore hold that the 16-month delay between the permanency planning hearing in August 1983 and the tribe's first expression of intent to intervene, in December 1984, was sufficient to establish "good cause" under the Act and the guidelines for the court to deny the transfer petition.

*Matter of Adoption of Holloway* (1986) 48 Utah Adv.Rep.3 [732 P.2d 962] is inapposite. In that case, as in *Matter of Appeal in Pima County etc.* (1981)

130 Ariz. 202 [635 P.2d 187], cert. denied, *sub nom. Catholic Social Services of Tucson* v. *Pima County* (1982) 455 U.S. 1007 [71 L.Ed.2d 875, 102 S.Ct. 1644] and *Matter of Adoption of Baby Child* (1985) 102 N.M. 735 [700 P.2d 198], the Indian child was born to a domiciliary of the reservation, and was subsequently removed to an adoptive placement outside the reservation. The issue in those cases was whether the child took the domicile of its mother so as to defeat the state court's assumption of jurisdiction. In all three cases, the state courts held that the child retained the domicile of its mother, and therefore the tribal court had exclusive jurisdiction, under 25 United States Code section 1911(a). The Utah Supreme Court, in *Halloway,* therefore voided the child's adoption. (*Id*. at p. 970.) The issue here is not, as in those cases, whether the state court's original assumption of jurisdiction was proper but whether, once having assumed jurisdiction, the state court was compelled to transfer jurisdiction to a tribal court. We hold, under the facts shown, that it was not.

We also hold that sufficient evidence supports the court's finding of "good cause" to deny transfer on the basis of subdivision (b)(iii) of the guidelines. The guideline's comments on this subdivision reveal that it was included on the strength of the House report on the Act (H.R.Rep. No. 95-1386, pp. 8, 21 (1984), reprinted in 1978, U.S. Code Cong. & Admin. News, p. 7530) that 25 United States Code section 1911(b) "is intended to permit a State court to apply . . . a modified doctrine of *forum non conveniens,* in appropriate cases, to insure that the rights of the child as an Indian, the Indian parents or custodian, and the tribe are fully protected." (44 Fed.Reg., *supra,* at p. 67591; see also *Matter of Appeal in Pima County etc., supra,* 635 P.2d at p. 191.) The guidelines acknowledge that "Application of this criterion will tend to limit transfers to cases involving Indian children who do not live very far from the reservation." (44 Fed.Reg., *supra,* at p. 67591.)

The trial court, in citing this ground as good cause to deny the transfer petition, noted the fact that Robert had spent his life in or near Santa Clara County, that court, department of social services and probation department records were all located there, that social workers, probation officers, public health nurses, foster parents and Indian center staff members all worked there, that one expert witness resided in the county and the other two were closer to Santa Clara County than to the pueblo in New Mexico. Devon and her three younger children had lived in the San Jose or Fresno area until February 1985, when they moved to the reservation. Robert's maternal grandparents, who had participated in the dependency proceedings, were also residents of Santa Clara County. The only New Mexico witness testifying in these proceedings was Mrs. Atencio. The court also noted that in such a complex case, proximity of the court to the numerous records and

witnesses in the proceedings had been of great assistance in facilitating the presentation of evidence. These are all pertinent and adequate reasons to deny transfer on the basis of subdivision (b)(iii) of the guidelines. (See *In re Interest of Bird Head* (1983) 213 Neb. 741 [331 N.W.2d 785, 790]; *In Interest of J. R. H.* (Iowa 1984) 358 N.W.2d 311, 317.) We are therefore satisfied that substantial evidence supports the trial court's finding of "good cause" to deny transfer on the ground that the state court forum provided the better opportunity for the production of valuable evidence.

■ The trial court denied the transfer petition on the additional ground that it would injure Robert's best interests. Appellant argues that this was not appropriate under the Act. We disagree. The stated purpose of the Act, as we have already noted, is to "protect the best interests of Indian children." (25 U.S.C. § 1902.) We are satisfied that this is a pertinent and indeed a necessary consideration in deciding whether to grant or deny a transfer request. (*Matter of M.E.M.* (1981) 195 Mont. 329 [635 P.2d 1313, 1317.) Both the petitioner's expert witness and the expert witness for the tribe reported that Robert was strongly bonded to his foster-adoptive family, and that he perceived them as his psychological family. Both also opined that it would be psychologically injurious to remove Robert from this setting. The only evidence presented to rebut this testimony was that of Devon's expert witness, Evelyn Blanchard. She testified that Robert would not be irreparably harmed by a move to the reservation. This witness, however, had never met Robert or his foster-adoptive family, and based her opinion solely on a home visit with Devon's extended family on the pueblo in New Mexico. The court noted that the other two experts were far more persuasive in assessing the harm which might befall Robert were he to be removed from his psychological family. ■ The weight and credibility to be accorded the witnesses' testimony are matters for the trial court. (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925 [101 Cal.Rptr. 568, 496 P.2d 480]; *In re Marriage of Slivka* (1986) 183 Cal.App.3d 159, 162 [228 Cal.Rptr. 76].) ■ We thus agree that the court properly considered Robert's best interests in denying transfer.

■ Devon's second claim of error concerns Robert's placement with his foster-adoptive family, the H's. She argues that this placement violated 25 United States Code section 1915, and that the court was obligated to compare the fitness of Robert's foster-adoptive parents to that of his maternal aunt and uncle, the T's, who wished Robert to live with them on the pueblo in New Mexico.

We find this argument to be without merit. 25 United States Code section 1915 states: "(a) In any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the

contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families. [¶] (b) Any child accepted for foster care or preadoptive placement shall be placed in the least restrictive setting which most approximates a family and in which his special needs, if any, may be met. The child shall also be placed within reasonable proximity to his or her home, taking into account any special needs of the child. In any foster care or preadoptive placement, a preference shall be given, in the absence of good cause to the contrary, to a placement with [¶] (i) a member of the Indian child's extended family; [¶] (ii) a foster home licensed, approved, or specified by the Indian child's tribe; [¶] (iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; . . ."

We first note that until this appeal is final, Robert is not freed for adoption. His placement with the H's therefore does not come under the aegis of 25 United States Code section 1915(a). This placement was a preadoptive placement and therefore comes only under the auspices of 25 United States Code section 1915(b). But this placement was not made by the court below, but by the juvenile court during the course of the underlying dependency proceedings. Civil Code section 232 et seq. provides no authority for a court hearing a termination petition to place or to review either a foster or a preadoptive placement for a dependent child. The juvenile court's jurisdiction over Robert continued while the termination petition was pending, and will presumably not terminate until this appeal is final and an adoption decree is filed. Any complaint Devon may have concerning the propriety of Robert's placement with the H's should therefore be made to the juvenile court. Since Devon has not appealed from the juvenile court order, any issue concerning the propriety of Robert's placement with his foster-adoptive family is not properly before this court.

We are constrained, however, in view of the expression of these concerns, to make the following observations.

Mr. Trabue, the American Indian social worker assigned to Devon's case in December 1982, testified that he was aware of the dictates of the Act concerning placement of Indian children with their family members or in an Indian foster home. In March and April 1983, however, Devon did not know her tribal affiliation. Sometime in March Mr. Trabue was provided by Roberta Kipp of the San Jose Indian Center with a certificate indicating that Vickie T. was a member of the Santo Domingo Pueblo, and that Devon's father, Frederick T., was an Alaskan Indian or Eskimo. In May 1983, therefore, Mr. Trabue contacted Mrs. Atencio, the Santo Domingo tribe's social worker, and she mentioned that there were relatives on the pueblo. Mr. Trabue had considered placing Robert with his maternal

grandmother, Vickie T., but decided against this because of her own problems. He then requested referrals for Indian foster families from the department of social services, from the San Jose Indian Center and from a social worker in Alameda County. He also placed an advertisement for an Indian foster family in a San Jose newspaper. Robert's foster-adoptive parents responded to this advertisement. Mrs. H is part Pima Indian; Mr. H is part Miwok. Mrs. H testified that at the time the ad appeared, she and her husband were considering adopting a child, and followed up on the ad because they were of Indian heritage, and Robert needed an Indian family. In the meantime, Mr. Trabue confirmed Robert's status as an Indian child with the Bureau of Indian Affairs and was provided his tribal affiliations and the contact persons for the respective tribes.

Thus, from the spring of 1983 until February 1985, while Devon was living either in the San Jose or the Fresno area, (most of the time out of touch with her social workers), neither she, nor her parents, nor the tribe provided Mr. Trabue with any possible alternative placements within the family for Robert. Mr. Trabue complied with both the letter and the spirit of the Act when he searched out an Indian family within the immediate geographical area who could provide a permanent adoptive home for Robert. Indeed, placing Robert in foster care or preadoptive placement with extended family members on the pueblo before February 1985, when Devon moved there, would have violated 25 United States Code section 1915(b)'s directive to place a child in proximity to his or her home.

Had the tribe offered the T's as a placement alternative when the juvenile court was considering and implementing a permanent plan for Robert, the court would have been afforded a reasonable opportunity to evaluate this placement for Robert. Offering it after Robert had already lived for over a year with his new family, however, would again have presented the risk of detriment to Robert from severing an established familial bond.

The trial court pointed out in its statement of decision that the H's are "actively involved in a life which includes and builds upon the Indian culture that each of them comes from. The[y] are also devoted to Robert's best interests. They recognize that he has Santo Domingo ties, and they have indicated an intention to insure that he visits with the Tribe and his family there as he grows up. It is an ideal situation for Robert. He will be able to remain with the family he is bonded to while learning about Indian culture not only from the [H's] but also from contacts with the Tribe and his relatives the[re]. . . . [¶] It is clear to this Court that Robert is not being robbed of his cultural heritage, nor will this action be devastating to him in his later development. [Citing Irving N. Berlin, M.D. *Anglo Adoptions of Native Americans: Repercussions in Adolescence,* American Academy of

Child Psychiatry (1978) 387, 388.) Instead, he will be provided stability now when he so desperately needs it and cultural experience from now through his adolescence so that a future identity crisis can be avoided." We are gratified to approve a decision which allows Robert to become a permanent member of a happy and secure family, while ensuring that he has the means to cultivate and live his Indian heritage.

The judgment and order are affirmed.

Brauer, J., and Capaccioli, J., concurred.

A petition for a rehearing was denied May 20, 1988, and appellant's petition for review by the Supreme Court was denied July 28, 1988.