In the Matter of C.E.H.
(a Minor), Plaintiff,

T.W. and M.L.W., Respondents,

v.

L.M.W., Natural Mother, Appellant,

R.H., Natural Father, Defendant.

No. WD 45292.

Missouri Court of Appeals,
Western District.

Aug. 25, 1992.

Motion for Rehearing and/or Transfer to
Supreme Court Denied
Sept. 29, 1992.

Application to Transfer Denied
Oct. 27, 1992.

James Franklin Ralls, Jr., Kansas City, for appellant.

John Roger Cady, Platte City, for respondents.

Before HANNA, P.J., and FENNER and ULRICH, JJ.

HANNA, Presiding Judge.

This case involves termination of the parental rights of appellant/mother, L.M.W. (hereinafter referred to as "natural mother"), who is a member of the Cherokee Indian Nation of Oklahoma, holding Cherokee registry number C0062066. The issues raised on appeal concern the jurisdiction of this state to entertain the termination of parental rights and adoption proceeding and the applicability of the Indian Child Welfare Act of 1978 (the "Act").[1]

The natural mother grew up in Kansas City, Missouri. In January, 1988, at age eighteen, she met the natural father and they commenced living together. The natural mother became pregnant, but before the child's birth both natural parents moved to Pittsburg, Kansas. The child, C.E.H., was born October 29, 1988 and remained with the natural mother for two months until the child began making the mother "crazy." At this point, the child was taken to the maternal grandmother's residence in Oklahoma. The child stayed with the grandmother about four or five months until the grandmother demanded the natural mother take back custody of the child. The natural mother was then living in Springfield, Missouri and traveled to the grandmother's house to pick up the child. Shortly thereafter, because of her inability to tolerate children, the natural mother took the child to the maternal grandfather's house in Kansas City, Missouri. She allegedly remarked: "Things haven't changed at all … I love [children], but I can't take more than two hours and they make me crazy."

The natural father believed it would be in the best interests of C.E.H. to place the child for adoption. In that regard, he contacted Mr. Robert Michael, his childhood mentor. Some time in late 1988, both natural parents and Mr. Michael went to an attorney in Kansas City, Missouri to discuss the possibility of placing C.E.H. with adoptive parents. After meeting with the attorney, the natural parents asked Mr. Michael to help them find someone who would adopt the child.

As a result of inquiries, the adoptive mother, T.W., expressed an interest in adopting C.E.H. Due to medical problems T.W. was unable to have children of her own. T.W.'s parents (the "adoptive grandparents") then contacted Mr. Michael who further explored the possibility of adoption.

Mr. Michael had consulted with both natural parents on many occasions concerning the adoption. At all times, the natural mother expressed her opinion that it would be in the best interests of C.E.H. to be adopted by someone else. Consents for adoption were prepared and on August 25, 1989, the natural parents traveled to Kansas City, Missouri to execute the consent forms. After signing the forms, Mr. Michael again discussed the adoption with the natural parents, both individually and together. The natural mother continued to stress her sincere desire to have C.E.H. adopted. An error was subsequently discovered in the consent forms which required them to be redone. New consent for adoption forms were prepared and a few days later they were again executed by both natural parents.

The natural parents traveled to Oklahoma in late August 1989, picked up C.E.H., transported the child to Kansas City, and left the child in the care of Mr. Michael.[2] Mr. Michael immediately transported C.E.H. to the home of the adoptive mother. At that time, C.E.H. was ten months old and has since continued to reside with the adoptive parents.

On September 7, 1989, the adoptive mother petitioned the trial court for adoption of the child and on September 28, 1989, the court transferred temporary custody to her. It was on this same day that the natural mother signed a withdrawal of her consent, which was filed with the court on October 4, 1989. On the following day, the natural mother's attorney filed a motion to

---

1. The Act is codified in Title 25 U.S.C. § 1901 et seq. All statutory references are to that Title of the U.S.C. unless otherwise indicated.

2. At what time the child left the custody of the maternal grandfather is unclear. We assume the child was returned at some point to the maternal grandmother in Oklahoma.

dismiss the termination of parental rights and adoption proceeding claiming the Act governed the controversy and pursuant to § 1913, once a natural parent withdraws consent, the child is to be returned to the natural parent.

In response to these events, the adoptive grandmother traveled to Springfield, Missouri to discuss the purported withdrawal of consent with the natural mother. During that visit, the natural mother repeatedly told the adoptive grandmother she desired for the adoptive mother to continue with the legal proceedings to adopt C.E.H. The adoptive grandmother testified that the natural mother said, "When you leave and go back to Kansas City tell [the adoptive mother] not to worry. I don't want the baby and the best place for her is with [the adoptive mother]." The natural mother complained the withdrawal of consent was executed because her parents had threatened to disown her if she allowed the adoption to continue. She required the support of her family to subsist because the natural father only came home sporadically and she was again pregnant.[3] She told the adoptive grandmother that she never intended to bring C.E.H. home from the hospital but was persuaded to do so by her parents. She vowed not to make that mistake with the child with whom she was then pregnant. As a result, after the birth of her second child, the natural mother promptly gave the child up for adoption.

The natural mother also told the adoptive grandparents that neither the maternal grandmother nor the maternal grandfather provided a proper environment for her child. Later that afternoon the natural father returned home with some friends and the natural mother introduced the adoptive grandparents as the child's grandparents. When the adoptive grandmother remarked that the natural mother had withdrawn her consent for adoption, the natural father became very upset and asked her why she did that, since she could

not take care of the child. The mother became emotional, but agreed. The father indicated he wanted the adoption to proceed.

The adoptive grandparents told the natural mother to telephone at any time if she ever wanted to see where the child was living, or have contact with the child. The natural parents visited the adoptive grandparents' family business on a couple of occasions during the first six months of 1990, but during their visits neither parent requested permission to visit with the child. The next contact by the natural parents with the adoptive grandparents came when the natural father called them at home and said he and the natural mother had been picked up for shoplifting. The adoptive grandparents next heard from him in January, 1991, when he called to tell them he was living in his automobile in Gladstone, Missouri. Shortly thereafter, he informed them he was at the Kansas City jail and requested funds to post bond.

As indicated, the adoptive mother filed a petition for transfer of custody and adoption on September 7, 1989. This petition was in the nature of a voluntary termination of parental rights/adoption proceeding and a guardian ad litem was appointed. The case was first set for disposition April 26, 1990. After consent was withdrawn by the natural mother,[4] the adoptive mother and the guardian ad litem filed an application for continuance and on February 7, 1990, the court granted leave to the adoptive mother to file a first amended petition alleging the natural parents neglected and/or abandoned the child. The first amended petition transformed the case to an involuntary termination of parental rights. On April 5, 1990, a second amended petition was filed which presented the same factual basis for adoption, but included the fact that the adoptive mother had married and listed her husband as an additional petitioner.

3. The record indicates the natural parents have never married.

4. The attorney for the natural father filed a withdrawal of consent at the final hearing in

this matter. Prior to that time, the natural father gave no indication he wanted the termination/adoption proceeding to end.

The case was reset for trial August 7, 1991, via telephone conferences between the attorneys and the judge. The record indicates the attorney for the natural mother notified her of the court date by letter. On the day of trial, the attorney for the natural mother moved for a continuance, alleging he had been unable to notify his client of the hearing date. The continuance was denied and the hearing proceeded.

Neither of the natural parents appeared at the hearing, however both were represented by counsel. The natural father's sister was present and stated to the court that the natural mother wanted to appear but was unable because she had flown to Peoria, Illinois the day before. Both adoptive parents were at the hearing. At the request of the natural mother's attorney there was a representative from the Heart of America Indian Center present who stated she was at the trial to make sure the procedural requirements of the Indian Child Welfare Act were followed. Also in court was the child's guardian ad litem, a juvenile officer from the 6th Judicial Circuit, and several witnesses who testified at the hearing, including the adoptive grandmother, a medical expert, and Mr. Michael. Two registered notices were sent to Tanya Coming Deer of the Cherokee Indian Nation of Oklahoma, but no representative from the tribe appeared.

On August 12, 1991, the natural parents' rights were terminated on a finding that both natural parents had willfully abandoned and neglected the child. On that same day, an order approving the adoption was issued and this appeal followed.

■ The first issue is whether the Indian Child Welfare Act is applicable, and if so, whether the trial court had jurisdiction to hear the matter or whether the case should have been transferred to the tribal court of the Cherokee Indian Nation of Oklahoma.

The Indian Child Welfare Act of 1978 was enacted in response to concern over "an alarmingly high percentage of Indian families [being broken up] by the removal, often unwarranted, of their children from them by non-tribal public and private agen-

cies...." Section 1901(4). The Act's purpose is "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families...." Section 1902. The Act specifically applies to all "child custody proceedings" involving "Indian children," as those terms are defined by § 1903.

An action for the termination of parental rights and/or adoption is a "child custody proceeding" under § 1903(1)(ii) and (iv). The present case is such a proceeding. An "Indian child" is defined by § 1903(4) as "any unmarried person who is under age 18 and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe...." C.E.H. is the biological child of the natural mother, who was a member of the Cherokee Indian Nation in Oklahoma. The record indicates the child was eligible for membership in his mother's tribe. Therefore, C.E.H. was an "Indian child" as defined by § 1903 and it would appear that the Act should control the entire case. However, our analysis concerning the applicability of the Act should not end at this point.

While our initial focus in determining the applicability of the Act has been on whether C.E.H. was an "Indian child," born the biological child of an "Indian mother," the question might be more decisively answered by determining whether removal of the child from [or better stated in the alternative, "return of the child to"] the natural mother is a situation falling within the purview of the Act. The issue is whether, under the particular facts of this case, application of the Act would further the policies and purposes behind it.

■ The Act was promulgated in an effort to counteract the large scale separations of Indian children from their families, tribes, and culture through adoption or foster care placement, generally in non-Indian homes. *Matter of Adoption of Crews*, 118 Wash.2d 561, 825 P.2d 305, 308 (1992). The House Report accompanying the Act stated that it "seeks to protect the rights of the Indian child as an Indian and the rights of the Indian community and tribe in retaining

its children in its society." *Id.*, 825 P.2d at 309. It does so by establishing a federal policy that, where possible, an Indian child shall remain in the Indian community, and by making sure the Indian child's welfare determinations are not based on "a white, middle class standard which, in many cases, forecloses placement with [an] Indian family." *Id.* The underlying thread which runs throughout the entire Act is that it is concerned with the removal of Indian children from *an existing Indian family unit* and the resultant breakup of the Indian family. *Id. citing In re Adoption of Baby Boy L.*, 231 Kan. 199, 643 P.2d 168 (1982). (Emphasis added).

In this case, it is difficult to conclude that C.E.H. has ever been a part of an existing Indian family unit or Indian community. There is no evidence that either of the natural parents, or their families, have ever lived on the Cherokee Indian reservation in Oklahoma. There is no indication that the natural mother plans to relocate to Oklahoma. The natural father has no ties to any Indian tribe or community and consistently opposed C.E.H.'s removal from the adoptive parents. There was no evidence by the natural mother or anyone else that the child would grow up in an Indian environment if the child were returned to the natural mother. To the contrary, the evidence is clear that the natural mother has never shown any substantive interest in her Indian heritage in the past nor is there any indication this will change in the future. *Id.*, 825 P.2d at 310.

Our United States Supreme Court has made it clear that the purpose of the Act is to avoid the:

> [r]emoval of Indian children from their cultural setting [because such removal] seriously impacts a long-term tribal survival and has damaging social and psychological impact on many individual Indian children.

*Id. citing Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 52, 109 S.Ct. 1597, 1609, 104 L.Ed.2d 29 (1989). This quotation appears to support the conclusion that the Act is not applicable where an Indian child is not being removed from an Indian cultural setting, where the natural parents have no substantive ties to a specific tribe, and where neither of the parents nor their families have resided or plan to reside within a tribal reservation. *See Crews*, 825 P.2d at 310.

In conclusion, we doubt that application of the Act would further the policies and purposes behind it in this specific situation. *Id. See also Matter of Adoption of T.R.M.*, 525 N.E.2d 298, 303 (Ind.1988). However, being exceedingly sensitive to the valuable purposes of the Act and considering the substantial impact of our decision today, we proceed to evaluate the natural parents' claims as if the Act were to apply in all respects.

■ Assuming the Act applies, we must determine whether jurisdiction should have been transferred to the tribal court in Oklahoma under § 1911. The Act provides that "[a]n Indian tribe shall have jurisdiction exclusive as to any State over any child custody proceeding involving an *Indian child* who resides or is domiciled within the reservation of such tribe ... [or] [i]n any State court proceeding for the foster care placement of, or termination of parental rights to, an *Indian child* not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of *good cause* to the contrary, shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent, *upon the petition of either parent or the Indian custodian or the Indian child's tribe....*" Section 1911(a) and (b). (Emphasis added).

Section 1911(a) is not applicable because the evidence shows neither the child nor the natural mother have ever resided or were ever domiciled within the reservation of the tribe. Therefore, if jurisdiction of the tribal court is to be obtained it must be pursuant to subsection (b). Pursuant to subsection (b), the case must be transferred *"upon the petition* of either parent or the Indian custodian or the Indian child's tribe," in the absence of "good cause" to the contrary. (Emphasis added). Where no petition to transfer has been filed, or upon the showing of "good cause" not to

transfer to the tribal court, jurisdiction of the case belongs in state court.

Contrary to the allegation in appellant's brief, there is no petition to transfer jurisdiction in the record. Section 1911(b) expressly requires a petition to transfer be tendered to effectuate this section of the Act. The natural mother's attorney filed a Motion to Dismiss, but it specifically requested dismissal of the adoption action and return of the child to the natural mother, not transfer to the tribal court pursuant to the Act. The only reference in the motion to the Act was for the specific purpose of presenting § 1913 to the court, which allows a parent to withdraw consent at any time prior to entry of final decree of termination of parental rights or adoption. This motion was apparently never ruled upon and the parties proceeded to allow the trial court to determine all the issues presented. There was a representative of the Heart of America Indian Center present at the proceeding, but this representative was not asked to appear by the tribe and never raised the jurisdictional issue. No petition to transfer or to intervene was ever filed by the tribe. Prior to appeal, neither the mother nor any other party ever raised the issue of jurisdiction. Therefore, there was no reason for the adoptive parents or the court to address the jurisdictional issue, nor was there any burden on the adoptive parents to offer proof of "good cause" not to transfer the case to the tribe. However, assuming the court should have considered transferring the case on its own initiative, absent "good cause" shown, we find that good cause not to transfer the case was established at trial.

■ The Act does not define what constitutes "good cause" to deny transfer. However, good cause has been examined by several jurisdictions and directional guidelines have been published by the Bureau of Indian Affairs ("BIA") of the Department of Interior. See T.R.M., 525 N.E.2d at 307 and 44 Fed.Reg. 67,583 and 67,591 (1979).

The BIA guidelines provide in part:

(b) Good cause not to transfer the proceeding may exist *if any* of the following circumstances exist:

(i) The proceeding was at an advanced stage when the petition to transfer was received and the petitioner did not file the petition promptly after receiving notice of the hearing.

(ii) The Indian child is over twelve years of age and objects to the transfer.

(iii) The evidence necessary to decide the case could not be adequately presented in the tribal court without undue hardship to the parties or the witnesses.

(iv) The parents of a child over five years of age are not available and the child has little or no contact with the child's tribe or members of the child's tribe.

(c) Socio-economic conditions and the perceived adequacy of tribal or Bureau of Indian Affairs social services or judicial systems may not be considered in a determination that good cause exists.

(d) The burden of establishing good cause to the contrary shall be on the party opposing the transfer.

These guidelines are helpful but are not binding upon state proceedings. *T.R.M.*, 525 N.E.2d at 307. The primary responsibility for interpreting language used in the Act rests with the courts that decide Indian child custody cases. *Id.* n. 3.

■ The "best interests of the child" have been considered valid considerations to determine whether or not to transfer jurisdiction. *Id.* at 308. *See also Matter of T.S.*, 245 Mont. 242, 801 P.2d 77, 80 (1990) and *In re Interest of C.W.*, 239 Neb. 817, 479 N.W.2d 105, 114 (1992). Many courts have also applied a modified doctrine of *forum non conveniens* suggested by (b)(iii) of the BIA guidelines and in accordance with the commentary to the guidelines, which explains:

Consideration of whether or not the case can be properly tried in tribal court without hardship to the parties or witnesses ... with respect to the § 1911(b), "[t]he subsection is intended to permit a State

court to apply a modified doctrine of *forum non conveniens*, in appropriate cases, to insure that the rights of the child as an Indian, the Indian parents or custodian, and the tribe are fully protected." *Chester County Dept. of Social Serv. v. Coleman*, 303 S.C. 226, 399 S.E.2d 773, 775 (1990).

The doctrine of *forum non conveniens* is modified in the Indian child custody context to allow state courts to determine whether the tribal court is a less convenient forum. *Id.* The guidelines also acknowledge that "application of this criteria will tend to limit transfers to cases involving Indian children who do not live very far from the reservation." *Id.*, *citing* 44 Fed.Reg. at 67,591.

One jurisdiction has rejected the "best interests of the child" theory, but has applied the modified *forum non conveniens* standard. *See In the Interest of Armell*, 194 Ill.App.3d 31, 141 Ill.Dec. 14, 19–21, 550 N.E.2d 1060, 1065–67 (1990). The Illinois court held that the best interests of the child, as referred to in § 1902, are relevant to the ultimate determination concerning placement of the child, but it would not stretch the theory to decide whether to transfer jurisdiction. We agree and think a more appropriate determination would come from applying the BIA guidelines. In that respect, we adopt the modified *forum non conveniens* standard to resolve the transfer issue.

■ Several courts have considered geographical obstacles to find "good cause" not to transfer under a *forum non conveniens* analysis, as where almost all the parties and witnesses reside in the county of the State court and have no contact with the tribal court. *See Coleman*, 399 S.E.2d at 776, and cases addressed therein. In applying a modified doctrine of *forum non conveniens* "the trial court should consider practical factors that make trial of the case easy, expeditious, and inexpensive, such as the relative ease of access to sources of proof, the cost of attendance of witnesses,

and the ability to secure attendance of witnesses through compulsory process." *C.W.*, 479 N.W.2d at 113, *citing Matter of Wayne, R.N.*, 107 N.M. 341, 757 P.2d 1333 (1988); and *In re Appeal in Maricopa County Juvenile Action*, 828 P.2d 1245, 1249 (Ariz.App.1991). Since termination of parental rights under § 1912(f) requires evidence beyond a reasonable doubt that the child will suffer serious emotional or physical damage if returned to the parent, the parties would undoubtedly utilize the testimony of neighbors, friends, family, teachers, social workers, and psychologists to show their fitness as parents, the child's emotional and physical adjustment and the harm to the child if removed and returned to the parent or if the court refuses to return the child. *See Coleman*, 399 S.E.2d at 776.

In this case, virtually all of the evidence to decide the case was adequately presented at the trial court and it would have created undue hardship to the parties and witnesses to travel to Oklahoma to try the case. All the witnesses who testified were from the Kansas City area, except for Mr. Michael who stated he now lived in Lincoln, Nebraska.[5] The social worker and the representative from the Heart of America Indian Center were both from the Kansas City area. Also, there was no indication that any party or witness had any affiliation with the tribal court. Therefore, the tribal court would have been a considerably less convenient forum than the State court.

In addition to our analysis under subsection (b)(iii) of the BIA guidelines, subsection (b)(i) of the guidelines provides that good cause not to transfer exists if the trial is at an advanced stage when the petition to transfer was filed and the petition was not filed promptly after notice of the child custody proceeding. In the case of *In Re Robert T.*, 200 Cal.App.3d 657, 246 Cal. Rptr. 168 (1988), the court found a five month delay between receiving notice of the termination hearing and filing of the petition to transfer by the tribe, constituted

---

**5.** We acknowledge that the natural father's sister stated she had traveled from Dallas, Texas, to be at the hearing but she was not a witness.

good cause not to transfer. *See Maricopa County*, 828 P.2d at 1250. Similarly, in *Maricopa County*, the court found good cause after a two-year delay. *Id.* at 1251. Here, there was evidence that all parties and the Cherokee Indian Nation of Oklahoma had notice of the action well in advance of the hearing and chose not to file a petition to transfer. No petition to transfer was ever filed with the state court and the jurisdictional issue was first raised in this appeal, over two years after the adoptive mother filed her initial petition.

Considering the location of the witnesses and evidence, lack of participation by the tribe or the natural parents, and the fact that no petition to transfer was ever filed, we find that "good cause" existed not to transfer the case to the tribal court. Appellant's first point is denied.

Since the trial court had proper jurisdiction to hear the matter, we now address the remaining points raised by the appellant. The natural mother claims the trial court failed to apply a "beyond a reasonable doubt" standard to the termination of parental rights and challenges the expert's qualifications. As indicated above, § 1912(f) of the Act states that "no termination of parental rights may be ordered ... in the absence of a determination, supported by evidence *beyond a reasonable doubt,* including testimony of *qualified expert witnesses,* that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." (Emphasis added). Two issues arise from this section of the Act and they coincide with the natural mother's second and third points. First, was there a finding beyond a reasonable doubt that return of the child to the natural mother would likely result in serious harm to the child; and second, was there any testimony from a qualified expert witness to that effect? We address the expert testimony first.

■ There was testimony from Dr. Rosalyn E. Inniss, M.D., as to the welfare of the child. Dr. Inniss was a medical doctor; a psychiatrist licensed in the states of Missouri, Kansas and Michigan; she accomplished her adult psychiatry residence of two years at Western Missouri Mental Health Center; she participated in a psychiatric fellowship at The Menninger Foundation; she was a member in training of the Topeka Psychoanalytic Institute for five years; she ran a unit at the Topeka State Hospital for adolescent males and females; she was at the Center for Forensic Psychiatry in Anaheim, Michigan for one year; and she is presently one of four child psychiatrists in the country with additional forensic training. She is board certified in both adult and child psychiatry and has been an examiner for both specialty boards. She worked at the Johnson County Mental Health Center where she supervised a family sexual abuse program and conducted general psychiatry. She also testified that she was aware of the issues concerning the rearing of an Indian child outside the Indian heritage and that she gave a great deal of consideration to the child's Native American Indian ancestry before reaching her conclusions.

The phrase "qualified expert" witness is not defined by the Act, but legislative history reveals that it is meant to apply to expertise beyond the normal social worker's qualifications. *T.R.M.,* 525 N.E.2d at 311. The BIA also defined the phrase in 44 Fed.Reg. 67,583, 67,593 (1979) as follows:

(b) persons with the following characteristics are most likely to meet the requirements for a qualified expert witness for purposes of Indian child custody proceedings:

(i) A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family or organization in childrearing practices.

(ii) A lay expert witness having substantial experience in the delivery of child and family services to Indians, an extensive knowledge of prevailing social and cultural standards in childrearing practices within the Indian child's tribe.

(iii) A professional person having substantial education and experience in the area of his or her specialty. *Id.*

Dr. Inniss had extensive education and experience and was a qualified expert within the meaning of the Act. She considered the child's Indian ancestry and any lack of experience of the Indian way of life in no way compromised or undermined the value of her testimony. *See C.W.*, 479 N.W.2d at 111.

Dr. Inniss testified that she met with the adoptive parents and the child on more than one occasion for examination purposes. She stated her findings revealed the child and adoptive parents had formed a "bond" and that a "significant attachment" existed between them. She also testified that after reviewing the medical records she determined the natural mother lacked parenting skills and that the child had a rash which was secondary to flea bites resulting from flea infestation in the home. She concluded that removing the child from the adoptive home and returning the child to the natural mother would "set up trouble for her psychologically."

There was an abundance of evidence that neither natural parent wanted to keep C.E.H. The child was with the natural mother only two months following the birth before the mother left her with the maternal grandmother. When the child was returned to her, she immediately placed the child with the maternal grandfather. At ten months of age the child was placed with the adoptive mother. In all, the child only lived with the natural mother for a few months of her life. When the child was delivered to Mr. Michael it had a rash on her entire body (the result of a yeast infection and flea bites), it had an eye infection, and the child was unclean. The mother had repeatedly stated the child made her "crazy." Both natural parents were transient, had never been married, and had been in trouble with the law. Neither natural parent ever attempted to visit C.E.H. after the child was placed in the adoptive home, although the opportunity was always available. After the birth of her second child, that child was immediately placed for adoption. There was also evidence the natural mother lacked sufficient parenting skills and had no desire to learn.

The court found by clear and convincing evidence that the child had been abandoned and neglected.[6] To find abandonment § 211.447.2(1)(b) RSMo requires evidence that the "parent has, without good cause, left the child without any provision for parental support and without making arrangements to visit or communicate with the child, although able to do so," for a period of six months. To find neglect § 211.447.2(2)(d) RSMo requires evidence that there was "[r]epeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education ... or other care and control necessary for his physical, mental, or emotional health and development."

In the case of *D.D.C. v. B.C.*, 817 S.W.2d 940 (Mo.App.1991), this court found abandonment pursuant to § 211.447.2(1)(b), where there was no evidence introduced by the mother to show she had made any type of financial contribution towards the support of her children; where the mother primarily relied on the maternal grandmother to provide for her children; where she failed to send any money for her children's support; where she managed to send only a few letters and Christmas gifts to the children; where there was no evidence to indicate she was unable to obtain some type of employment; and where she received government checks and used the funds to support herself rather than her children. *Id.* at 943. Furthermore, the court found the mother failed to make arrangements to visit or communicate with the children because she had moved to Texas with her new husband and left the children in Missouri claiming the car was too full of her and her new husband's belongings, leaving no room for the children; she never visited the children during the eleventh month period preceding the termination proceeding; she had only telephoned

---

6. The court made its findings based on the standard provided by the Missouri Revised Statutes which are applicable to termination of parental rights proceedings. *See generally § 211.442 et seq. RSMo (Cum.Supp.1992).*

the Division of Family Services on a few occasions to ask about the children; and she had only sent the children a few letters and presents. *Id.*

The *D.D.C.* court also found neglect pursuant to § 211.447.2(2)(d), where the mother had failed to provide the basic fundamental needs for her children. *Id.* The testimony indicated the home was filled with trash, dirty clothes, old food, and was infested with roaches; the mother had failed to feed the children properly and failed to provide them adequate shelter; and the children were very small and underdeveloped for their age. *Id.*

In this case, the evidence shows that the sporadic, inconsistent contact the natural mother would exercise, were she given access to the child, would diminish the child's ability to properly grow and bond to other individuals which is so necessary for healthy development and that the natural mother was unfit to raise the child. Her lack of responsibility and significant degree of disinterest in the child leads to the conclusion the child would be irreparably damaged by further contact with the natural mother in a parental relationship. We find the facts of this case support a finding of both abandonment and neglect.

The trial court expressly found "evidence beyond a reasonable doubt that the return of custody of the minor child to the natural mother is likely to result in serious emotional damage to the minor child." Dr. Inniss' testimony, combined with other evidence at trial, supports this finding as required by § 1912(f) of the Act. We find there was sufficient evidence in the record to support the trial court's ruling and the natural parents' second and third points are denied accordingly.

▋ The natural mother next complains that the trial court erred in failing to find that active efforts to provide remedial services had been made. Section 1912(d) provides that "any party seeking to effect ... termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent breakup of

the Indian family and that these efforts have proved unsuccessful."

On several occasions, while in Kansas City, Missouri, the natural parents failed to see the child or even request a visit. Prior to the adoption, there was a great deal of discussion between the natural parents and Mr. Michael concerning the adoption and whether the natural parents wanted to keep the child. The natural parents stated on numerous occasions that they did not want the child and neither appeared at trial. Both parents initially signed two separate consent forms, and testimony suggested the natural mother's withdrawal of consent was obtained by coercion. The father consistently stated the child should be left with the adoptive family and his withdrawal of consent was not filed until the day of trial. The natural parents were never married and the natural mother had indicated to the adoptive grandparents that the natural father only came home sporadically. The evidence taken as a whole raises the question of whether an "Indian family" ever existed.

The testimony of Dr. Inniss was that remedial and/or rehabilitative programs were provided to the natural mother by Home Health Care. She further testified that these efforts became futile and proved unsuccessful when the natural mother took the child out of the state and left it with a maternal grandparent. The facts show the mother delivered the child to the maternal grandmother within two months of its birth, and subsequently to the maternal grandfather. The adoptive grandparents made several trips to the natural mother's residence to discuss the adoption proceeding and were repeatedly assured that the natural mother did not want the child and desired the child be placed with the adoptive mother. The natural parents failed to show any interest whatsoever in the child.

Based on this evidence, the finding of the trial court that active efforts were made to provide remedial services and rehabilitative programs designed to prevent the breakup of the natural mother and the minor child, and that efforts to do this were unsuccess-

958

ful, was not erroneous. The point is denied.

■ The natural mother also claims that she was permitted, under the Act, to withdraw her consent at any time, for any reason, and the trial court erred in finding her consent to the adoption was proper. Pursuant to § 1913(c) "[i]n any *voluntary* proceeding for termination of parental rights to, or adoptive placement of, an Indian child, the consent of the parent may be withdraw for any reason at any time prior to the entry of a final decree of termination or adoption ... and the child shall be returned to the parent." (Emphasis added). However, this provision only applies to *voluntary* proceedings. The proceeding at hand was an involuntary proceeding and the consent form originally signed and the subsequent withdrawal were not the issue. The alleged error and the court's order concerning the consent issue are moot and the point is denied accordingly.

Appellant next claims the trial court erred in finding either abandonment or neglect because there was insufficient evidence to support such a finding. The court found abandonment and neglect by clear and convincing evidence. Without rehashing all the evidence previously described in this opinion, we find that there was sufficient evidence to support a finding of abandonment and neglect. This point is without merit.

■ Appellant's final point claims error in failing to grant her request for a continuance in order to allow her to appear at the hearing, or in the alternative to take the matter under advisement to allow her to later appear and give evidence that she was not in contact with her attorney. Appellant's attorney was present at the trial and requested a continuance stating:

"I believe that if my client were here we would be able to be in a better position to present the evidence in a light most favorable to my client. I have contacted the family.... It's my understanding that my client was in Texas yesterday but flew to Illinois and therefore she cannot be here today. Her father, who is a local resident, attempted to get her and got as far as Tulsa, Oklahoma, but was told that his daughter was no longer in Texas. For those reasons, I would ask the court that this adoption be set over to another date."

The court responded "... This matter has been pending for some time, right?" The attorney's response was "That's correct, Your Honor."

The appellant's attorney went on to say that he had not been in contact with the appellant on a regular basis because she moved from place to place. He did state he notified appellant by mail on June 26 that the court date was set for August 7, 1991. He also contacted her father, a local resident, and left a message with her younger sisters that the case was set for August 7, 1991 and that they should get in touch with him. The natural father's sister indicated appellant knew about the hearing and was upset that she couldn't attend. The attorney for the natural father indicated that the natural father also knew the date of the court hearing. Still, neither of the natural parents appeared. Considering the nature of the action and the transient history of the natural parents, denial of the mother's continuance was not an abuse of discretion.

Judgment Affirmed.

All concur.